## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**LOTUS INDUSTRIES, LLC d/b/a Centre Park Bar**,
**GWENDOLYN WILLIAMS, CHRISTOPHER**
**WILLIAMS,** and **KENNETH SCOTT BRIDGEWATER**,

Case No. 16-cv-

                       Plaintiffs,

Hon.

v.

**MICHAEL DUGGAN**, in his official capacity as Mayor of the
City of Detroit, **DETROIT ECONOMIC GROWTH**
**CORPORATION**, **CITY OF DETROIT DOWNTOWN**
**DEVELOPMENT AUTHORITY**, **MARSHALL**
**BULLOCK**, in his official capacity as an appointee of Mayor
Mike Duggan,  **POLICE CHIEF JAMES CRAIG**, in his
official capacity as Chief of Police for the City of Detroit,
**DENNIS ARCHER, JR.**, and **GOTHAM CAPITAL**
**PARTNERS, LLC**,

                       Defendants.

_____/

ANDREW A. PATERSON (P18690)
Attorney for Plaintiffs
46350 Grand River, Suite C
Novi, MI 48374
(248) 568-9712
aap43@outlook.com
_____/

          There is no other civil action between these parties arising out of
the same transaction or occurrence as alleged in this Complaint
pending in this Court, nor has any such action been previously
filed and dismissed or transferred after having been assigned to a
judge.

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

NOW COME PLAINTIFFS, LOTUS INDUSTRIES, LLC, D/B/A CENTRE PARK BAR ("**Centre Park**"), GWENDOLYN WILLIAMS ("**Plaintiff G. Williams**"), CHRISTOPHER WILLIAMS ("**Plaintiff C. Williams**"), and KENNETH SCOTT BRIDGEWATER ("**Plaintiff Bridgewater**") (collectively referred to herein as "**Plaintiffs**"), by and through their attorney, ANDREW A. PATERSON, and for their Verified Complaint for Declaratory Judgment and Injunctive Relief ("**Verified Complaint**"), state as follows:

## I.   NATURE OF PLAINTIFFS' CLAIMS

1.     Plaintiffs' claims are brought pursuant to 42 U.S.C. § 1983; 28 U.S.C. §§ 1331, 1337, 1343, and 1367; and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq.*

2.     Plaintiffs allege in **Count I** of the Verified Complaint that a declaratory judgment should be issued declaring that Defendants, individually and collectively, retaliated against Plaintiffs for exercising their First Amendment Rights by purposely and deliberately having the Detroit Police Department harass the Plaintiffs and their patrons by issuing frivolous noise citations to damage and close Plaintiffs' business establishment.

3.     Plaintiffs allege in **Count II** of the Verified Complaint that a declaratory judgment should be issued declaring that Defendant Dennis Archer Jr. conspired with Defendants Mike Duggan, Marshall Bullock, Downtown Development

Authority, Detroit Economic Growth Corporation and Chief James Craig to retaliate against the Plaintiffs for exercising their First Amendment Rights.

4.      Plaintiffs allege in **Count III** of the Verified Complaint that Defendants Duggan and Chief James Craig have denied them Equal Protection Under the Law as guaranteed by the Fourteenth Amendment to the United States Constitution.

5.      Plaintiffs allege in **Count IV** of the Verified Complaint their state law claim of promissory estoppel.

6.      Plaintiffs allege in **Count V** of the Verified Complaint their state-law claim of tortious interference with their business.

7.      Plaintiffs allege in **Count VI** of the Verified Complaint their state-law claim of trespassing.

8.      Plaintiffs allege in **Count VII** of the Verified Complaint that an injunction should issue preliminarily and permanently enjoin the Defendant Downtown Development Authority from transferring ownership to Defendants Dennis Archer, Jr. and Gotham Capital Partners LLC of the building and property housing their business.

9.      Plaintiffs allege in **Count VIII** of the Verified Complaint that Plaintiffs must be awarded their attorney fees and costs pursuant to 42 U.S.C. § 1988.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over Plaintiffs claims pursuant to 42 U.S.C. 1983; 28 U.S.C. §§ 1331, 1337, 1343, and 1367.

11.    This Court also has jurisdiction to render and issue a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq.*

12.    Venue is proper under 28 U.S.C. § 1391 because Plaintiffs' place of business is located within the Eastern District of Michigan, and the actions giving rise to this Complaint all occurred within the Eastern District of Michigan.

## III.    PARTIES

13.    Plaintiff Centre Park is a limited liability company organized under the laws of the State of Michigan, whose principal place of business is located at 1407 Randolph Street, Detroit, Michigan 48226, which is in the Harmonie Park section of downtown Detroit, and which is now called the Paradise Valley Cultural and Entertainment District.

14.    Plaintiff Gwendolyn Williams ("**Plaintiff G. Williams**") is the majority owner of Centre Park. (**See Plaintiff G. Williams' affidavit attached as Exhibit A**).

15.    Plaintiff Christopher Williams ("**Plaintiff C. Williams**") is co-operator of Centre Park.  (**See Plaintiff C. Williams' affidavit attached as Exhibit B**).

16.     Plaintiff Kenneth Scott Bridgewater ("**Plaintiff Bridgewater**") is co-operator of Centre Park. (**See Plaintiff Bridgewater's affidavit attached as Exhibit C**).

17.     Defendant Mike Duggan ("**Defendant Duggan**") is the duly elected Mayor of the City of Detroit and is a member of the Defendant City of Detroit Downtown Development Authority's Board of Directors.

18.     Defendant Detroit Economic Growth Corporation ("**Defendant DEGC**") is a corporation organized under the laws of the State of Michigan, whose principal place of business is located at 500 Griswold St., Ste. 220, Detroit, Michigan 48226.

19.     Defendant City of Detroit Downtown Development Authority ("**Defendant DDA**") is a public authority that is governed by a 14-member board of directors, which includes Defendant Duggan and other appointees of the Defendant Duggan. Defendant DDA's principal place of business is located at 500 Griswold St., Ste. 220, Detroit, Michigan 48226.

20.     Defendant Marshall Bullock ("**Defendant Bullock**") is a mayoral appointee of the Defendant Duggan and also served as a member of the Defendant DDA's Paradise Valley Evaluation Committee ("PV").

21.     Defendant Chief James Craig ("**Defendant Chief Craig**") is the duly appointed Chief of Police for the City of Detroit.

22.     Defendant Dennis Archer, Jr. ("**Defendant Archer**") is the managing member of the Defendant Gotham Capital Partners, LLC.

23.     Defendant Gotham Capital Partners, LLC ("**Defendant Gotham**") is a limited liability company organized under the laws of the State of Michigan, whose principal place of business is located within the City of Detroit, Michigan.

## GENERAL ALLEGATIONS

### A.     The Parties entered into a Lease Agreement.

24.     In 2013, Plaintiff G. Williams and Kenneth Bridgewater made the decision to invest in a restaurant and bar, commonly known as Centre Park, located at 1407 Randolph Street, Detroit, Michigan 48226 (the "**Property**").

25.     Prior to their investment, the Property had lain dormant and unoccupied for five years. On August 19, 2013, Centre Park executed a lease with Defendant DDA for the Property (the "**Lease**").  (**See Lease Agreement by and between Plaintiff Centre Park and Defendant DDA attached as Exhibit D**).

26.     The initial term of the Lease does not expire until August 19, 2018 and the Lease provides that Centre Park "shall have the option to extend the Term of this lease from the date upon which it would otherwise expire for two (2) additional periods of five (5) years each."   (**See § 3.2 of the Lease attached hereto as Exhibit D**).

27.     Centre Park invested over $200,000 in development and construction to bring the property up to code and to meet local ordinances occupancy codes. Centre Park invested another $250,000 in finishes, décor, trade fixtures, equipment and inventory before commencing its operation of the business.  The total build-out of the Property took nearly seven months, with work crews working seven days a week at times.

28.     Since its opening for business, Centre Park has become a vibrant and lively addition to downtown Detroit.  It is now known as a destination for many patrons and it regularly attracts patrons attending a multitude of area events, including Detroit Tigers and Detroit Lions games.  Since Centre Park opened it has operated very successfully, at a profit, and it has never been delinquent on its Lease obligations to the Defendant DDA.

**B.     Defendants DDA and DEGC Accepts Proposals for Redevelopment of the Paradise Valley Cultural and Entertainment District including the Property and the DDA and DEGC Made Promises to Centre Park which Centre Park Relied upon to Its Detriment.**

29.     On September 28, 2015, Defendant DDA published a Request for Proposals ("**RFPs**") setting up a process for and seeking development proposals from qualified developers to acquire properties owned by the Defendant DDA in the area formerly known as, Harmonie Park, and to now be called the "Paradise Valley Cultural and Entertainment District". The Defendant DDA stated that it sought through the RFPs' proposals to reestablish throughout the new District the cultural

vibrancy and economic vitality that the old Paradise Valley area of Detroit had once had.

30.     The Defendant DDA's RFPs included the Property as one of the properties for which it sought such redevelopment.

31.     During the RFP process, and without seeking permission of Centre Park, Defendants DDA and DEGC unlawfully and repeatedly gained access to, and trespassed upon, the Property for the apparent purpose of allowing appraisers, and potential RFP bidders, including Defendants Archer and Gotham, to examine, assess and otherwise gain knowledge about the Property.

32.     Centre Park prepared a development proposal for the Property pursuant to the RFP.

33.     Shortly after 3:00 p.m. on November 11, 2015, Centre Park's RFP proposal was accepted by the Defendants DDA and DEGC.  Such proposal included the purchase and redevelopment of the Property.  (**See Centre Park's Proposal attached as Exhibit E**).

34.     The Defendants DDA and DEGC accepted Centre Park's proposal and its representative told and promised Centre Park that the Defendant DDA would be considering its RFP proposal 'in the normal course.'

35.     Several weeks later, however, and notwithstanding the clear statements, promises and representations made to Centre Park, and upon which it had relied,

Centre Park received a notice from the Defendant DDA that its proposal was deemed untimely and was therefore rejected by the DDA.  (**See Centre Park's Proposal Rejection Letter attached as Exhibit E**).

36.    Thereafter, Plaintiff G. Williams and other Centre Park representatives made repeated attempts to contact and to discuss with members of the Defendants Duggan, DDA, and DEGC's staff to have the DDA reverse its claim that the Centre Park RFP proposal was untimely and to have the DDA consider Centre Park's RFP proposal.

37.    Plaintiff G. Williams sent numerous emails to top level administrative staff of the Defendant Duggan outlining and informing them of the unlawful and unethical actions taken by the DDA during the RFP process to cause the Centre Park RFP proposal to be disregarded and for Defendants Archer's and Gotham's proposal to be the winning bid.

38.    Plaintiff C. Williams also informed different members of the Detroit City Council of the unlawful and unethical taken by the DDA during the RFP process.

39.    Plaintiffs G. Williams and C. Williams also publicly questioned whether the Defendants DDA, Duggan, and the DEGC had unlawfully and unethically *predetermined* which RFP proposals would be accepted and which would be rejected.

40.     Plaintiffs G. Williams and C. Williams had so publicly questioned this predetermination because Defendants Archer had said things to Plaintiffs Williams and Bridgewater during the RFP process that indicated that Defendants Archer and Gotham believed that they had been "guaranteed" that their RFP proposal would be chosen by the Defendant DDA and that they would be purchasing the Property.

41.     Soon after Plaintiffs began exposing the unlawful and unethical conduct of the Defendants, Centre Park began experiencing unexpected visits to the Property from multiple police officers of the Detroit Police Department.

42.     In July 2016, Lt. Lewis of the Detroit Police Department and about approximately 8 to10 additional police officers converged upon Centre Park and began harassing and intimidating Centre Park's patrons - even threatening some with imprisonment if they did not immediately leave the Property.

43.     Then, on or about August 6, 2016 at approximately1:10 a.m., Lt. Lewis and about 20 Detroit Police Officers again converged on Centre Park and ordered all the patrons to leave the Property and they issued to Plaintiff C. Williams a noise violation citation ticket, an ordinance misdemeanor offense.

44.     Lt. Lewis informed Plaintiff C. Williams at that time that he had been given a direct order to shut down Centre Park by Defendants Duggan and Chief Craig.

45.     On or about October 5, 2016, Defendant Bullock personally visited Centre Park and spoke with Plaintiff Bridgewater.

46.    During that October 5, 2016 visit, Defendant Bullock expressed to Plaintiff Bridgewater that Centre Park's patrons were not "the type of clientele" the Defendant Mayor wanted in Downtown Detroit. Centre Park's patrons are predominately African-Americans.  Defendant Bullock further expressed to Plaintiff Bridgewater that Centre Park would be evicted from the Property by January 2017 because it would be found in violation of its Lease.

47.    Plaintiff Bridgewater politely asked Defendant Bullock to leave the Property. Defendant Bullock began using loud, profane and threatening language directed toward Plaintiff Bridgewater.

48.    The actions of the Detroit Policemen at the direction of Defendants Chief Craig and Duggan taken against Centre Park, Plaintiffs G. Williams, C. Williams and Bridgewater, were taken in retaliation against them by the Defendants because Plaintiffs have publicly exposed the unlawful and unethical actions of the Defendants DDA, DEGC, Duggan, Archer and Gotham during the DDA's RFP process.

49.    Centre Park and Plaintiffs G. Williams, C. Williams, and Bridgewater continue to be retaliated against by Defendant Duggan and Defendant Chief Craig because Detroit Police Officers continue to frequently visit Centre Park when it hosts booked events for its patrons. This practice of frequent visits by the police is to disrupt the events and to make patrons uncomfortable. It is a practice that had

not been done prior to Plaintiffs exposing the unlawful and unethical conduct of the Defendants in the DDA's RFP process.

50.     No other bar or restaurant establishments in the immediate area have been subjected to the frequent constant police harassing visits that Centre Park and the Plaintiffs have been subjected to.

51.     Centre Park and Plaintiffs have been singled out for publicly exposing the unlawful and unethical actions of the Defendants and they have thus been denied equal protection under the law by the Defendants Duggan and Chief Craig.

52.     Because Defendant Archer has strong political connections or relationships with the high level elected officials of the City of Detroit, Plaintiffs believe that Defendant Archer has conspired with the Defendants to retaliate against the Plaintiffs, all in an effort to acquire the Property and to evict Centre Park.

53.     Specifically, Plaintiffs believe that Defendant Archer conspired with Defendants Duggan, DDA, DEGC, and Chief Craig by privately requesting certain business owners in the area to contact the Defendant Duggan and/or Defendant Chief Craig and to complain about "loud music" being played at Centre Park during its events held for its patrons.

54.     Plaintiffs believe that Defendant Archer conspired with the Defendants to have the noise complaint ticket issued in order to have a pretextual basis upon which the Defendant DDA could seek to terminate Centre Park's Lease.

## COUNT I - FIRST AMENDMENT RETALIATION CLAIM

55.     Plaintiffs incorporate, repeat, and reallege the foregoing allegations as though they were fully set forth and stated herein.

56.     On September 28, 2015, Defendant DDA published a Request for Proposals setting up a process for and seeking development proposals from qualified developers to acquire properties owned by the Defendant DDA in the area formerly known as, Harmonie Park, and to now be called the "Paradise Valley Cultural and Entertainment District". The Defendant DDA in the RFPs said that it sought to reestablish throughout the new District the cultural vibrancy and economic vitality that the old Paradise Valley area of Detroit had once had.

57.     The real property that Centre Park's business occupies, the Property, was included in the properties descriptions in Defendant DDA's RFPs.

58.     During the RFP process, and without seeking permission of Centre Park, Defendants DDA and DEGC unlawfully and repeatedly gained access to, and trespassed upon, the Property for the apparent purpose of allowing appraisers, and potential RFP bidders, including Defendants Archer and Gotham, to examine, assess and otherwise gain knowledge about the Property.

59.     Centre Park prepared a development proposal for the Property pursuant to the RFP.

60.    Shortly after 3:00 p.m. on November 11, 2015, Centre Park's RFP proposal was accepted by the Defendants DDA and DEGC. Such proposal included the purchase and redevelopment of the Property. (**See Centre Park's Proposal attached as Exhibit D**).

61.    The Defendants DDA and DEGC accepted Centre Park's proposal and its representative told and promised Centre Park that the Defendant DDA would be considering its RFP proposal 'in the normal course.'

62.    After several weeks, notwithstanding the clear representations made to Centre Park and upon which it relied, Centre Park received a notice from the Defendant DDA, that Centre Park's proposal was *untimely* and, thus, it was rejected by the Defendant DDA. (**See Centre Park's Proposal Rejection Letter attached as Exhibit E**).

63.     Immediately thereafter, Plaintiff G. Williams and other Centre Park representatives, made repeated attempts to contact and to discuss with members of the Defendants Duggan, DDA, and DEGC's respective staffs the issues attendant to Centre Park's submission of its proposal that was claimed to be untimely by the DDA.

64.     Plaintiff G. Williams sent numerous emails to top level administrative staff of the Defendant Duggan outlining and informing them of the unlawful and unethical process that was utilized by the DDA during the RFP process.

65.     Plaintiff C. Williams also informed members of the Detroit City Council of the unlawful and unethical process that was used by the Defendant DDA during the RFP process to the great detriment of the Plaintiffs.

66.     Plaintiffs G. Williams and C. Williams also publicly questioned whether the Defendants DDA, Duggan, and the DEGC had unlawfully and unethically *predetermined* which proposals would be accepted and which would be rejected.

67.     Plaintiffs G. Williams and C. Williams had so publicly questioned this predetermination because Defendants Archer had said things to Plaintiffs Williams, during the RFP process that indicated that Defendants Archer and Gotham believed that they had been "guaranteed" that their RFP proposal would be chosen by the DDA and that they would be the successful bidder purchasing the Property.

68.     Soon thereafter, Centre Park began experiencing unexpected visits to the Property from multiple police officers of the Detroit Police Department.

69.     In July 2016, Lt. Lewis of the Detroit Police Department and about approximately 8 to10 additional police officers converged upon Centre Park and began harassing and intimidating Centre Park's patrons - even threatening some with imprisonment if they did not immediately leave the Property.

70.     Then, on or about August 6, 2016 at approximately1:10 a.m., Lt. Lewis and about 20 Detroit Police Officers again converged on Centre Park and ordered all

the patrons to leave the Property and they issued to Plaintiff C. Williams a noise

violation citation ticket, an ordinance misdemeanor offense.

71.    Lt. Lewis informed Plaintiff C. Williams at that time that he had been given

a direct order to shut down Centre Park by Defendants Duggan and Chief Craig.

72.    On or about October 5, 2016, Defendant Bullock personally visited Centre

Park and spoke with Plaintiff Bridgewater.

73.    During that October 5, 2016 visit, Defendant Bullock expressed to Plaintiff

Bridgewater that Centre Park's patrons were not "the type of clientele" the

Defendant Mayor wanted in Downtown Detroit. Centre Park's patrons are

predominately African-Americans.  Defendant Bullock further expressed to

Plaintiff Bridgewater that Centre Park would be evicted from the Property by

January 2017 because it would be found in violation of its Lease.

74.    Plaintiff Bridgewater politely asked Defendant Bullock to leave the

Property. Defendant Bullock began using loud, profane and threatening language

directed toward Plaintiff Bridgewater.

75.    The actions of the Detroit Police Officer, at the direction of Defendants

Chief Craig and Duggan, taken against Centre Park, Plaintiffs G. Williams, C.

Williams and Bridgewater, were taken in retaliation against them by the

Defendants because Plaintiffs have publicly exposed the unlawful and unethical

actions of the Defendants DDA, DEGC, Duggan, Archer and Gotham during the DDA's RFP process.

76. Centre Park and Plaintiffs G. Williams, C. Williams, and Bridgewater continue to be retaliated against by Defendant Duggan and Defendant Chief Craig because Detroit Police Officers continue to frequently visit Centre Park when it hosts booked events for its patrons. This practice of frequent visits by the police is to disrupt the events and to make patrons uncomfortable. It is a practice that had not been done prior to Plaintiffs exposing the unlawful and unethical conduct of the Defendants in the DDA's RFP process.

77. No other bar or restaurant establishments in the immediate area have been subjected to the frequent constant police harassing visits that Centre Park and the Plaintiffs have been subjected to.

78. Centre Park and Plaintiffs have been singled out for publicly exposing the unlawful and unethical actions of the Defendants and they have thus been denied equal protection under the law by the Defendants Duggan and Chief Craig.

79. Because Defendant Archer has strong political connections or relationships with the high level elected officials of the City of Detroit, Plaintiffs believe that Defendant Archer has conspired with the Defendants to retaliate against the Plaintiffs, all in an effort to acquire the Property and to evict Centre Park.

80.    Specifically, Plaintiffs believe that Defendant Archer conspired with Defendants Duggan, DDA, DEGC, and Chief Craig by privately requesting certain business owners in the area to contact the Defendant Duggan and/or Defendant Chief Craig and to complain about "loud music" being played at Centre Park during its events held for its patrons.

81.    Plaintiffs believe that Defendant Archer conspired with the Defendants to have the noise complaint ticket issued in order to have a pretextual basis upon which the DDA could seek to terminate Centre Park's Lease.

82.    The foregoing actions of the Defendants were taken in retaliation against the Plaintiffs for the Plaintiffs public statements about the unlawful, unethical and corrupt practices of the Defendants.

## COUNT II  - DEFENDANT ARCHER CONSPIRED WITH DEFENDANTS DUGGAN, DDA, CHIEF CRAIG TO RETALIATE AGAINST PLAINTIFFS FOR EXERCISING THEIR FIRST AMENDMENT RIGHTS

83.    Plaintiffs incorporate, repeat, and reallege the foregoing allegations as though they were fully set forth and stated herein.

84.    Plaintiffs believe and allege that Defendant Archer's political relationships and connections with and to the high level elected officials of the City of Detroit, has allowed Defendant Archer to conspire with the Defendants to acquire the Property and to cause retaliation against the Plaintiffs for their public exposure of such actions.

85.     Specifically, Plaintiffs believe that Defendant Archer has conspired with Defendants Duggan, DDA, DEGC, and Chief Craig by privately requesting and encouraging certain business owners in the Paradise Valley area to call the Defendant Duggan and/or Defendant Chief Craig to complain about "loud music" being played at Centre Park.

86.     Plaintiffs believe and allege that Defendant Archer and Defendants DDA and Duggan have a private agreement that they will do 'whatever it takes' to ensure that Centre Park is evicted from the Property by January 2017 so that it can be transferred to Defendants Archer and Gotham and they can commence their business instead of the Plaintiffs' business on the Property.

87.     Specifically, Plaintiffs believe and allege that Defendant Archer and Defendants DDA, DEGC, and Duggan had a prior private agreement that Defendants Archer and Gotham would be awarded the development agreement to develop the Property that Centre Park currently leases.

88.     Defendant Archer had a private conversation with Plaintiffs C. Williams and Bridgewater during the RFP process, in which Defendant Archer informed Plaintiffs C. Williams and Bridgewater that Defendants Duggan, DDA and DEGC had already assured Defendant Archer that Defendant Gotham would be awarded the contract to develop the Property.

89.     During the RFP process, in October 2015, Defendant Archer invited Plaintiff C. Williams to a private meeting that was being held the office of James Jenkins, who is a member of the Defendant DDA.  At this meeting, Rev. Wendell Anthony, Hiram Jackson, Chris Jackson, and Defendant Archer were present. During this meeting, James Jenkins expressed that it had already been determined by the Defendants Duggan, DDA, and DEGC which bidders would be awarded the contracts to develop certain properties within Paradise Valley.

90.     Additionally, Defendant Archer and Defendants Duggan and Chief Craig have a private agreement that at any time any business owner in the Paradise Valley area calls to complain about "loud music" coming from Centre Park that Defendant Chief Craig will deploy officers to Centre Park to issue noise complaint citations to Plaintiffs Williams and Bridgewater and Centre Park patrons, and further require Plaintiffs Williams and Bridgewater to shut down the Plaintiffs' business at Centre Park for the remainder of the evening.

91.     Plaintiffs believe that Defendant Archer has conspired with the Defendants to have noise complaint tickets issued to establish a pretextual basis to use to terminate the Plaintiffs' Centre Park lease with the Defendant DDA.

## COUNT III  - PLAINTIFFS BEING DENIED EQUAL PROTECTION UNDER LAW

92.     Plaintiffs incorporate, repeat, and reallege the foregoing allegations as though they were fully set forth and stated herein.

93.     Plaintiffs' Centre Park business at the Property has been unfairly and unlawfully targeted for harassment by Defendants Duggan and Chief Craig because it is an African-American black owned business and the majority owner, Plaintiff G. Williams, is an African-American woman and because a majority of its patrons are African-American.

94.     No other bar or restaurant establishment in the Harmonie Park or Paradise Valley area have been subjected to the similar police harassment for purported noise complaints or for claimed "over capacity" violations of the City's Fire Code.

95.     To the best of their knowledge, information and belief, Centre Park and Plaintiffs are not aware of any City of Detroit ordinance that Centre Park has violated with respect to Centre Park by the playing of music or of being over capacity.

96.     Neither Centre Park nor any of the Plaintiffs had ever been ticketed for purported noise violations or over capacity violations before.

97.     Accordingly, Centre Park and Plaintiffs are being denied equal protection under the law. They are being unfairly and unlawfully targeted by the Defendants Duggan and Craig because they are a black-owned business and because their patrons are largely African-American.

## <u>COUNT IV  - PROMISSORY ESTOPPEL</u>

98.    Plaintiffs incorporate, repeat, and reallege the foregoing allegations as though they were fully set forth and stated herein.

99.    On or about November 11, 2015, Defendants DDA and DEGC explicitly represented to Centre Park that it had accepted its Proposal for the redevelopment of the Property for the new Paradise Valley Cultural and Entertainment District.

100.    Defendants DDA and DEGC's promise to Plaintiffs was clear, definite, and unequivocal and it was specifically made to induce Centre Park to believing that its Proposal was being taken into consideration.

101.    In reliance on the promise, and to its substantial detriment, Centre Park performed all that was expected of it and carried on its business operations under the belief and impression that it was being considered fairly in the proposal process.

102.    Despite Centre Park's repeated requests and demands, Defendants DDA and DEGC have simply refused to even consider Centre Park's actions or to otherwise take any action to address Plaintiffs' proposal and their concerns about the DDA's RFP process.

103.    To avoid injustice, this Court must specifically enforce Defendants DDA and DEGC's promise to fairly consider Centre Park's Proposal.

104.    At the time of making the promise and inducing the action on Centre Park's part, Defendants DDA and DEGC could reasonably foresee that their failure to perform pursuant to their promise would cause damage to Centre Park and the damage that it has in fact suffered.

105.    As a direct and proximate result of Defendants DDA and DEGC failure to perform or even consider Plaintiffs' Proposal, Plaintiffs have suffered damages that exceed $1 million.

106.    Centre Park is entitled to a judgment of this Court both compelling specific performance by Defendants DDA and DEGC to fairly consider Centre Park's Proposal for the purchase of the Property, and, to otherwise assess an award of damages against Defendants.

## COUNT V – TORTIOUS INTERFERENCE

107.    Plaintiffs incorporate, repeat, and reallege the foregoing allegations as though they were fully set forth and stated herein.

108.    From on or about September 28, 2015 to November 11, 2015, Defendants DDA and DEGC solicited bids for the redevelopment of the Property and the Paradise Valley Cultural and Entertainment District.

109.    During this process, Defendants DDA and DEGC have unlawfully gained access to Centre Park's Property.

110.   Defendants DDA and DEGC further refused to communicate or otherwise negotiate with Centre Park regarding the redevelopment proposal.

111.   Upon information and belief, Defendants DDA and DEGC have communicated to potential bidders that Centre Park would be closed or otherwise removed from the Property – despite Centre Park's lease continuing to until at least August 19, 2018.

112.   On or about June 28, 2016, Defendants DDA and DEGC announced via memorandum and publication the purported "winners" of its biased and unequitable bids for the redevelopment of the Paradise Valley district.

113.   Because the Defendants DDA and DEGC bidding and proposal process was flawed and inequitable, it was unlawful and contrary to Michigan law.

114.   The announcement discussed in the foregoing was publicized to customers, clients, and business contacts of Centre Park, with whom it held contracts, business relationships, or expectancies.

115.   The business relationships and expectancies had a reasonable likelihood of future economic benefit for Centre Park.

116.   Defendants DDA and DEGC knew of the contracts and business relationships and expectancies between Centre Park and its customers and business contacts.

117.   By its conduct of informing potential bidders and customers that Centre Park could be closed prior to the expiration of its Lease, and notifying the public of the results of its inequitable bidding process, which did not consider Centre Park's bid, Defendants DDA and DEGC intentionally and improperly interfered with the contracts and business relationships and expectancies between Centre Park and its customers.

118.   By its conduct of informing potential bidders that Centre Park could be closed prior to the expiration of its Lease, and notifying the public of the results of its inequitable bidding process, which did not consider Centre Park's bid, Defendants DDA and DEGC intended to, and did, interfere with the contracts and business relationships and expectancies, causing their breach, disruption, or termination.

119.   As a direct and proximate result of Defendants DDA and DEGC wrongful conduct, Centre Park has suffered substantial economic injury, loss of goodwill, harm to its business reputation, loss of esteem and standing in the community, and loss of business opportunities that exceed $1 million.

## COUNT VI – TRESPASSING

120.   Plaintiffs incorporate, repeat, and reallege the foregoing allegations as though they were fully set forth and stated herein.

121.   Centre Park is the lawful leaseholder of the Property as described in the Lease.

122.   Defendants DDA and DEGC, and its agents, trespassed upon the Property without Centre Park's knowledge and/or permission.

123.   While trespassing, Defendants DDA and DEGC manipulated and arranged Centre Park property and otherwise interfered with the premises.

124.   Defendants DDA and DEGC trespass to the Property was done intentionally, recklessly, and wantonly when Defendants DDA and DEGC knew that the Property belonged to Centre Park, and that Defendants DDA and DEGC had no right to take these actions.

125.   Defendants DDA and DEGC's actions have caused Centre Park damage, including, but not limited to, diminution in the value of the Property, and other damages that flow naturally and consequentially from these actions that exceed $1 million.

## COUNT VI –INJUNCTIVE RELIEF

126.   Plaintiffs incorporate, repeat, and reallege the foregoing allegations as though they were fully set forth and stated herein.

127.   Defendants DDA and DEGC made promises to Centre Park that it would accept, and consider, its proposal for the redevelopment of the Paradise Valley area; however, Defendants DDA and DEGC  unlawfully refused to do so.

128.   Defendants DDA and DEGC, through its conduct of trespassing and making untrue statements tortuously interfered with Centre Park's business contacts, relationships, and expectancies.

129.   A party who establishes the following four factors may be granted a temporary restraining order or preliminary injunction: (a) the likelihood that the party seeking the injunction will prevail on the merits; (b) the danger that the party seeking the injunction will suffer irreparable injury if the injunction is not issued; (c) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief; and (d) the harm to the public interest if the injunction is issued.

130.   Due to the conduct alleged in this Complaint, Centre Park is likely to succeed on the merits of its claims.

131.   Defendants DDA and DEGC unlawful and inequitable bidding process threatens the very existence of Centre Park.  Centre Park has no adequate remedy at law for the damages it has suffered and will continue to suffer due to Defendants' conduct.

132.   An injunction compelling Defendants DDA and DEGC to take no action with respect to the Property until it considers Centre Park's bid and otherwise addresses its concerns causes no harm whatsoever to Defendants DDA and DEGC.

133.   The public interest will be served by issuing a mandatory preliminary and permanent injunction.

134.   Considering these factors, Centre Park is entitled to immediate, preliminary, and permanent injunctive relief, and other such relief as the Court deems appropriate.

## COUNT VII
### Plaintiffs Shall Be Awarded Court Costs and Attorney Fees Under 42 U.S.C. § 1988.

135.   Plaintiffs incorporate, repeat, and reallege the foregoing allegations as though they were fully set forth and stated herein.

136.   This claim is brought pursuant to 42 U.S.C. §§ 1983, 1988.

137.    Plaintiffs shall be awarded their attorney's fees and costs pursuant to 42 U.S.C. § 1988 for any relief granted for any of the counts properly pled and alleged herein against the named Defendants.  See *Déjà vu of Nashville Inc. v Metro Gov't of Nashville and Davison County*, 421 F.3d 417 (6th Cir. 2005; and see also, *Berger v City of Mayfield Heights*, 265 F.3d 399, 406-407 (6th Cir. 2001).

## CONCLUSION AND PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiffs pray that this Honorable Court GRANT the requested relief as follows:

A. Issue A Declaratory Judgment declaring that the Defendants have retaliated against the Plaintiffs for exercising their First Amendment Rights.

B.  Issue a Declaratory Judgment declaring that the Defendants Archer and Gotham have conspired with Defendants Duggan, DDA, DEGC and Chief Craig to retaliate against the Plaintiffs for exercising their First Amendment Rights.

C.  Issue a Declaratory Judgment declaring that Defendants Duggan and Chief Craig have denied Plaintiffs Equal Protection under the Law as guaranteed under the Fourteenth Amendment.

D.  Issue a Declaratory Judgment declaring that the Defendants tortiously interfered with Plaintiffs business and business relationships and expectancy.

E.  Issue a Declaratory Judgment declaring that the Defendants trespassed on Plaintiffs' property.

F.  Issue an injunction enjoining the Defendants DDA and DEGC from transferring ownership of the Property to the Defendants Archer and Gotham.

G.  Award Plaintiffs their attorney fees and costs pursuant to 42 U.S.C. § 1988 against Defendants.

H.  Grant any further relief the Court deems appropriate, just and proper.


Dated:  November 19, 2016                     Respectfully Submitted,

                                              /s/ ANDREW A. PATERSON
                                              ANDREW A. PATERSON (P18690)
                                              Attorney for Plaintiffs
                                              46350 Grand River, Suite C
                                              Novi, MI 48374
                                              (248) 568-9712
                                              aap43@outlook.com