UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GWENDOLYN WILLIAMS, *et al.*,

    Plaintiffs,

v.

CITY OF DETROIT, *et al.*,

    Defendants.

Case No. 16-14112
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

**OPINION AND ORDER GRANTING THE DEGC'S
UNOPPOSED MOTION TO DISMISS [209]**

Lotus Industries, LLC ran Centre Park Bar. Not long after Centre Park opened, the City of Detroit announced plans to redevelop the neighborhood surrounding the bar. And the bar's managers submitted a proposal to take part in the redevelopment project. But their bid was rejected. And when Detroit announced the winning project, the redevelopment did not include Centre Park Bar. The bar's managers cried foul. Appearing on local radio stations and in local papers, they complained that the proposal process was rigged.

Soon after the public complaints, one of the bar's owners and two of its managers insisted the City and redevelopment officials retaliated against the bar. So Lotus, one of its members, and the bar's two managers brought suit. The individual plaintiffs say the retaliation escalated after they filed suit. Midway through this litigation, Lotus filed for bankruptcy. The bankruptcy trustee settled the lawsuit, leaving the three individuals as the only plaintiffs. Because the three individuals complain about the same injuries as the LLC, either they lack standing or they are not the real parties in interest. Recognizing this issue, Detroit Economic Growth Corporation moved to have the suit dismissed. Plaintiffs did not respond. The Court will grant the unopposed motion.

# I.

## A.

In 2013, Centre Park Bar opened in the Harmonie Park area of Detroit. Centre Park was owned by Lotus Industries, LLC. Lotus had two members: Gwendolyn Williams and Kenneth Bridgewater.[1] (ECF No. 211, PageID.5802.) Neither Gwendolyn nor Kenneth played any role in running Centre Park. (*Id.* at PageID.5803.) Instead, Gwendolyn's son Christopher Williams and Kenneth's son Kenneth Scott Bridgewater co-managed Centre Park. (*Id.*; *see also id.* at PageID.5799.) And over time, Centre Park became a popular downtown attraction. (*See, e.g.*, ECF No. 211, PageID.5928–5953; ECF No. 211-3.)

In 2015, Centre Park's landlord, the Detroit Downtown Development Authority, alongside the City of Detroit, revealed plans to redevelop the Harmonie Park area. (ECF No. 211, PageID.5806.) The DDA put out a request for proposals, and Christopher, along with Kenneth Scott, submitted one. Yet Kenneth Scott was late submitting the proposal. (*Id.* at PageID.5808–5809, 5530.) The rules governing the proposal process indicated that late proposals would not be considered. Even so, Kenneth Scott says the DDA's receptionist accepted the late proposal. (*Id.*; *see also id.* at PageID.5846.) Eventually, though, the proposal was rejected as tardy. (*Id.* at PageID.5530, 5824.)

Upset by the rejection, Christopher reached out to City and DDA officials to seek reconsideration. (ECF No. 211, PageID.5825–5829, 5530–5549.) Christopher says he had informal conversations with DDA officials and City Council members, many of whom said they

---

[1] Gwendolyn thought that Christopher might also be a member of the LLC. (ECF No. 211, PageID.5564.) However, Christopher said the LLC had only two members and he was not one of them. (*Id.* at PageID.5802.) None of the parties provided any documentation identifying the members of the LLC.

would look into why the bid was rejected. (*Id*.) When nothing came of Christopher's informal conversations, Christopher, Gwendolyn, and Kenneth Scott secured a meeting in the Mayor's Office with high-level DDA officials. (*Id*. at PageID.5831, 5535, 5543.) But the proposal was not reconsidered. (*Id*. at PageID.5551.) Eventually, Detroit announced the winning bidder of the redevelopment project, and the winner's proposal did not include Centre Park Bar. (*Id.* at PageID.5981–5982.)

Left out of the DDA's redevelopment project and faced with the loss of the business they managed, Christopher and Kenneth Scott publicly complained. They appeared on radio and in print calling the bid proposal process a sham. (ECF No. 211, PageID.5851.) The men came to believe the DDA had been working behind the scenes with the Detroit Economic Growth Corporation and the Mayor's Office to hand the redevelopment project to a preselected candidate. (*Id.* at PageID.5853–5855.) And they said they were in the boardroom where it happened. (*Id.* at PageID.5851.)

The bar managers believed their complaints led to retaliation. After complaining, they say Detroit police officers started to show up at the bar. (ECF No. 211, PageID.5890.) The officers said they were showing up in response to a neighboring hotel's noise complaints. (ECF No. 211, PageID.5890.) But Christopher suspected the hotel's complaints were all part of a conspiracy. To him, the hotel's noise complaints were manufactured by redevelopment officials and the Mayor's Office. (*Id.* at PageID.5890–5891, 5894, 6078–6079, 6100; *but see* ECF No. 211-3.) Christopher contends that even though other bars in the area operated outdoor spaces, and, like Centre Park, did so without the necessary permits, only Centre Park received police attention. (ECF No. 211, PageID.5891, 6097–6098.)

The police attention started to cost the bar business. (*Id.*) Fed up, Gwendolyn, Kenneth Scott, Christopher, and Lotus filed suit. (ECF No. 1.) Lotus and the individual plaintiffs alleged the Mayor's Office, Detroit police officers, and redevelopment officials conspired to violate Lotus' First Amendment rights and discriminate against the bar because it was a black-owned business attracting black clientele. (ECF No. 66, PageID.1937, 1942.) All told, Lotus and the individual owners and managers alleged First Amendment retaliation, equal protection, promissory estoppel, tortious interference, and trespass claims. (ECF No. 66.)

After bringing the lawsuit, Gwendolyn, Christopher, and Kenneth Scott say they were subjected to more retaliation. Though they never bothered the bar before, after the lawsuit, Detroit police officers issued Centre Park citations for fire code violations, over-occupancy, and even arrested Kenneth Scott. (ECF No. 66, PageID.1949.) Kenneth Scott says the arrest was retaliation for the lawsuit. (ECF No. 66, PageID.1950; ECF No. 211, PageID.5472–5475.) The DEGC also initiated eviction proceedings against Centre Park Bar. So the Plaintiffs amended their complaint to expand their First Amendment retaliation claims. (ECF No. 66.) Eventually, Centre Park Bar closed for good. And from Plaintiffs' perspective, Detroit, the DDA, and the DECG conspired to manufacture the closure as punishment for Lotus' attempts to expose the City's corruption. (*Id.*)

B.

Discovery took some time. In that time, Lotus filed for Chapter 11 bankruptcy protection. (ECF No. 126, PageID.2462.) As part of the bankruptcy proceeding, Lotus reached a settlement with all the defendants and dismissed its claims. (ECF No. 208.) Lotus' departure left only the

4

individual owners/managers as plaintiffs. And these individuals were pursuing the same claims against all Defendants.[2]

In time, all Defendants moved to put an end to the lawsuit. The City of Detroit moved for summary judgment. (ECF No. 211.) So did the DEGC. (ECF No. 210.) But the DEGC also moved to dismiss for lack of subject-matter jurisdiction, believing the individual owners and managers lack standing to sue. (ECF No. 209.)

## II.

The DEGC challenges subject-matter jurisdiction, based on a lack of standing, by way of a Rule 12(b)(1) motion. Rule 12(b)(1) motions mount either factual or facial attacks to subject-matter jurisdiction. *Cooper v. Rapp*, 702 F. App'x 328, 331 (6th Cir. 2017). Here, the DEGC opts for a factual challenge. A factual challenge means the Court need not accept the complaint at face value. *See Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045 (6th Cir 2015). Instead, the Court has "'substantial authority'" to "'weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *Global Tech., Inc. v. Yubei (Xinxiang) Power Steering Sys. Co.*, 807 F.3d 806, 814 (6th Cir. 2015) (quoting *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996)). And "the party invoking federal jurisdiction"—in this case the individual Plaintiffs—have "the burden to prove the existence of [federal] jurisdiction." *Funderwhite v. Local 55, United Ass'n*, 702 F. App'x 308, 311 (6th Cir. 2017) (citing *Russell*, 784 F.3d at 1045). Finally, even though the Court did not get any help from the Plaintiffs, it is required to police the boundaries of its limited jurisdiction. *Heartwood, Inc. v. Agpaoa*, 628 F.3d 261, 266 (6th Cir. 2010).

---

[2] The Court dismissed the individual plaintiffs' claims against the DDA as a discovery sanction. (See ECF No. 201.)

**III.**

The DEGC thinks Gwendolyn, Christopher, and Kenneth Scott lack Article III standing. To be sure, federal courts are, by design, courts of limited jurisdiction. For a federal court to have subject-matter jurisdiction, the plaintiff must have standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing requires an injury in fact to the plaintiff, caused by the defendant, and likely to be redressed by a favorable decision. *See Cranpark, Inc. v. Rogers Group, Inc.*, 821 F.3d 723, 730 (6th Cir. 2016) (citing *Lujan*, 504 U.S. at 560 (1992)).

The DEGC's standing argument goes as follows: Lotus, LLC settled and has been dismissed, leaving only the individual plaintiffs; to have Article III standing, the individual plaintiffs need an injury separate and distinct from the LLC's injury; but the individual plaintiffs and the LLC share the same injury, so none of the remaining plaintiffs have standing; and absent any plaintiff with standing, this Court lacks subject-matter jurisdiction.

At its core, the DEGC's argument rests on the shareholder-standing doctrine. The doctrine says shareholders cannot sue in their individual capacities to redress injuries suffered by the corporation. *See Franchise Tax Bd. of California v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990); *Nicholson v. Ticketmaster*, 42 F. App'x 696, 697 (6th Cir. 2002). Where a shareholder's claim derives from an injury to the corporation, the shareholder's claim belongs to the corporation. See 12B William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5911 (Perm. ed. 2000). A shareholder may only sue where the shareholder personally suffers an injury distinct from the corporation's injury. *See Harker v. Troutman (in Re Troutman Enters., Inc.)*, 286 F.3d 359, 364 (6th Cir. 2002).

So the issue presented is whether the individual plaintiffs can satisfy shareholder standing. There are two potential routes to resolving this issue. One route, marked by published and

unpublished opinions in the Sixth Circuit, treats shareholder-standing issues as a concern of Federal Rule of Civil Procedure 17's real-party-in-interest requirement. Another route, taken by an unpublished Sixth Circuit case, says shareholder standing implicates Article III. Either way, the individual plaintiffs' claims against the DEGC should be dismissed.

A.

It is possible that the individual plaintiffs lack Article III standing to bring their claims against the DEGC. To have Article III standing, a plaintiff needs a personal injury. *Lujan*, 504 U.S. at 560. And one unpublished Sixth Circuit case holds that even a sole shareholder of a corporation does not suffer a personal injury when suing "'based solely on an injury to the corporation.'" *Old Blast, Inc. v. Operating Eng'rs Local 324 Pension Fund*, 663 F. App'x 454, 457, (6th Cir. 2016) (quoting *Gaff v. Fed. Deposit Ins. Corp.*, 814 F.2d 311, 315 (6th Cir. 1987) modified at 933 F.2d 400 (6th Cir. 1991)); *see also 62-64 Kenyon St., Hartford LLC v. City of Hartford*, No. 16-cv-00617, 2017 U.S. Dist. LEXIS 212955, at *13–14 (D. Conn. Dec. 29, 2017); *but see Whelan v. Abell*, 953 F.2d 663, 671–72 (D.C. Cir. 1992). Rather, to establish Article III standing, a sole shareholder must suffer "an injury that is 'separate and distinct' from the corporation's injury." *Old Blast*, 663 F. App'x at 457 (quoting *Gaff*, 814 F.2d at 315).

Applying *Old Blast* to the facts at hand, the individual plaintiffs lack standing. The individual plaintiffs' claims all seek redress for injuries to Lotus, an LLC.[3] When Lotus went under, Gwendolyn, as one of only two members of Lotus, says she took a hit to her income and investment earnings. But Gwendolyn's injuries are analogous to "depreciation in the value of a

---

[3] Michigan LLC's are governed by the "rules regarding corporate form." *Salem Springs, LLC v. Salem Twp.*, 880 N.W.2d 793, 800–01 (Mich. Ct. App. 2015). And Michigan follows the default shareholder standing rule articulated above. *See Michigan Nat'l Bank v. Mudgett*, 444 N.W.2d 534, 536 (Mich. Ct. App. 1989) (establishing both the shareholder-standing rule and the exception for shareholders who have an individual injury).

shareholder's stock in a corporation" which "does not establish 'the type of direct, personal injury which is necessary to sustain a direct cause of action.'" *Old Blast*, 663 F. App'x at 457 (quoting *Gaff*, 814 F.2d at 315). And the other two individual plaintiffs were not even members of the LLC; they were employees who each lost income and future business earnings. So at best, they, too, bring suit to redress injuries suffered by Lotus. At bottom then, applying *Old Blast*, the individual plaintiffs bring derivative claims and thus lack Article III standing to bring their claims against the DEGC.

However, it is not a foregone conclusion that shareholder standing is a jurisdictional issue. Shareholder standing traces its roots to prudential limits on federal jurisdiction. *See Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002). Prudential limits are less about the power of a federal court to hear a case, and more about the wisdom of doing so. *See Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 934 (8th Cir. 2012). One of the prudential limits on standing bars person A from bringing the claims of person B, even if person A can satisfy Article III. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 17–18 (2004); *see also* Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.4 at 83 (5th ed. 2007). Shareholder standing logically follows from that rule: when a corporation (person B) is injured, a shareholder (person A) generally may not sue based on the indirect harm they suffered as a result of the corporation's injury. And the modern trend does not treat prudential standing doctrines as jurisdictional concerns. *See Knopick v. Jayco, Inc.*, 895 F.3d 525, 529–30 (7th Cir. 2018); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 185 (D.C. Cir. 2012) (Kavanaugh, J., dissenting) (collecting cases); *Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 756 (7th Cir. 2008); *see also* James M. Wagstaffe, *Wagstaffe Prac Guide: Fed Civil Proc Before Trial* § 15-IV (collecting authorities); *but see Animal Legal Defense Fund, Inc. v. Espy*, 29 F.3d 720, 723 n.2, 308 U.S. App. D.C. 74 (D.C. Cir. 1994); *Lexmark International, Inc.*

*v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014) (leaving open the possibility that third-party standing remains properly classified as a standing concern). So the shareholder-standing rule may not implicate Article III.

B.

Apart from addressing shareholder standing as an Article III issue, published and unpublished Sixth Circuit caselaw also looks to Federal Rule of Civil Procedure 17. *See Cranpark*, 821 F.3d at 730–31; *White v. JPMorgan Chase Bank, NA*, 521 F. App'x 425, 428 (6th Cir. 2013); *see also Wells Fargo Fin. Leasing, Inc. v. Griffin*, No. 13-00075, 2014 U.S. Dist. LEXIS 7702, at *19–21 (W.D. Ky. Jan. 22, 2014). Rule 17 codifies the real-party-in-interest defense. Fed. R. Civ. P. 17(a). And the real-party-in-interest analysis, says the Sixth Circuit, is another way to determine whether a shareholder has standing to sue. *See Cranpark*, 821 F.3d at 730–732 (applying real-party-in-interest analysis to issue of shareholder standing); *White*, 521 F. App'x at 428 (holding that the issue of shareholder standing is a question for Federal Rule of Civil Procedure 17). Moreover, the cases treating shareholder standing as a Rule 17 issue are clear that the real-party-in-interest analysis does not implicate Article III. *Cranpark*, 821 F.3d at 731–732; *White*, 521 F. App'x at 428; *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531–32 (6th Cir. 2002).

However, if Rule 17 is the proper way to challenge a shareholder's standing, then the DEGC may not have properly raised the issue by invoking Rule 12(b)(1). But the Court recognizes that the proper procedure for raising a real-party-in-interest defense is a gray area. *Whelan*, 953 F.2d at 672 n.7. The Sixth Circuit at least strongly suggests that real party in interest should be raised as an affirmative defense. *See Cranpark*, 821 F.3d at 730. Consistent with that approach, at least one Sixth Circuit panel has addressed the issue on summary judgment. *See White*, 521 F. App'x at 428. And other circuits allow the defense to be raised via other procedural vehicles—

though none suggest 12(b)(1). *See United Coal Companies v. Powell Const. Co.*, 839 F.2d 958, 960 (3d Cir. 1988) (Rule 17(a) motion); *Whelan*, 953 F.2d at 672 (Rule 12(b)(6) motion); James M. Wagstaffe, *Wagstaffe Prac Guide: Fed Civil Proc Before Trial* § 15-IV (Rule 21 motion, among others).

In any event, the DEGC's 12(b)(1) motion accomplishes the purposes of a Rule 17 motion. The DEGC's 12(b)(1) motion gave fair notice of the meat of the DEGC's contention: the individual plaintiffs' lacked shareholder standing. And all Rule 17 says is that the Court "may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). The key word in Rule 17(a)(3) is objection. Procedural flaws aside, the DEGC's motion mounts an objection. The thrust of the DEGC's motion explains why the plaintiffs are not real parties in interest. And the plaintiffs had a reasonable time to respond. They did not.

Moreover, because the DEGC's 12(b)(1) motion mounted a factual challenge, the individual plaintiffs' response could have considered the entire record. *See Global Tech., Inc.*, 807 F.3d at 814. On the entire record, the real party in interest is not difficult to discern. And "when the determination of the proper party is not difficult and when there has been no understandable mistake, dismissal is warranted despite Rule 17(a)(3)." *Barefield v. Hanover Ins. Co.*, 521 B.R. 805, 810 (E.D. Mich. 2014).

Pointing further toward proceeding ahead, Lotus *was* once a party to this case. But shortly after entering bankruptcy, Lotus settled its claims with the Defendants. (ECF No. 208.) So Lotus has nothing left to litigate. In the end, even though the DEGC's Rule 12(b)(1) motion is, in these circumstances, no glass slipper, it nonetheless fits.

So the Court turns to whether the three individuals are real parties in interest.

Given all of the above, consider, first, Gwendolyn. She was a member of the LLC. (ECF No. 211, PageID.5564.) And while Michigan law carves out limited circumstances where LLC members may sue based on the LLC's rights, *see* Mich. Comp. Laws 450.4510, Gwendolyn has done nothing to establish that this case falls within those limited circumstances. Instead, Gwendolyn seeks to bring these claims on her own behalf.

And Gwendolyn's explanation of her damages underscores the derivative nature of her claims. Gwendolyn said her damages amounted to a loss of investment opportunity and diminished returns on her investment.[4] (ECF No. 211, PageID.5589–5590.) Gwendolyn was an investor in Lotus. Lotus' only revenue came from Centre Park Bar. But Centre Park was injured and, as a result, lost customers and revenue. Eventually it closed. Ultimately, Centre Park's losses meant losses for Lotus, and losses for Lotus meant losses for Gwendolyn. So Gwendolyn's injury solely derives from Lotus' injury and she is not the real party in interest.

Next consider Christopher's and Kenneth Scott's claims against the DEGC. Neither Christopher nor Kenneth Scott were members of Lotus. Both were managers of Centre Park Bar. But just like Gwendolyn, both Christopher and Kenneth Scott said they sought redress for Lotus' losses, specifically Lotus' loss of business income. (See ECF No. 211, PageID.5980–5981, 6002–6004; ECF No. 209, PageID.4622–4623.) Accordingly, just like Gwendolyn, Christopher and Kenneth Scott have injuries that derive entirely from Lotus' injuries. They, too, are not the real parties in interest.

---

[4] At her deposition, Gwendolyn referred most questions about damages to Christopher. (ECF No. 211, PageID.5619–5625.) Christopher said the individual plaintiffs and Lotus suffered the same damages flowing from the same injuries. (ECF No. 211, PageID.5980–5981, 6002–6004.)

11

Finally, all three say the DEGC trespassed one time against Centre Park Bar. But that claim belongs to Lotus. Only Lotus, LLC has a property interest in the bar. *See* Mich. Comp. Laws 450.4504(2). So only Lotus can allege a trespass. *See Mable Cleary Trust v Edward-Marlah Muzyl Trust*, 686 N.W.2d 770, 786 (Mich. Ct. App. 2004).

## IV.

In summary, none of the individual plaintiffs' claims should proceed. Potentially, the individual plaintiffs lack Article III standing. Or, none of Gwendolyn, Kenneth Scott, or Christopher are the real parties in interest to enforce the claims they assert against the DEGC. Either way, their claims against the DEGC are dismissed.

And because the Court believes it can raise Rule 17 (and Article III) defects sua sponte, *see RK Co. v. See*, 622 F.3d 846, 851 (7th Cir. 2010); *Cont'l Ins. Co. v. N.A.D., Inc.*, 16 F. App'x 659, 661 (9th Cir. 2001), the Court orders the remaining parties to show cause, in writing, why the individual plaintiffs' claims against the remaining Defendants, with the exception of Kenneth Scott's First Amendment retaliation claim based on his personal arrest, should not be dismissed for reasons consistent with this opinion and order. The parties are to respond no later than 14 days from the date of entry of this order.

SO ORDERED.

                                                s/Laurie J. Michelson
                                                LAURIE J. MICHELSON
                                                UNITED STATES DISTRICT JUDGE

Date: June 7, 2019

CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, June 7, 2019, using the Electronic Court Filing system.

                                      s/William Barkholz
                                      Case Manager