UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH SCOTT BRIDGEWATER,

     Plaintiff,

v.

OFFICER ROBERT HARRIS and
CAPTAIN KELVIN HARRIS

     Defendants.

Case No. 16-14112
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

## OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [211]

This case arises out of a planned redevelopment project in an area of Downtown Detroit. Centre Park Bar was in the area slated for redevelopment. The bar's managers wanted to take part in the redevelopment project. But their proposal was rejected. Following the rejection, the bar's managers and one of its owners publicly complained about the bid process. And according to the bar managers and owner, the public complaints led to retaliation both from the City and from redevelopment officials. So this First Amendment retaliation lawsuit was commenced.

Originally, the plaintiffs consisted of Lotus, LLC, the entity that owned Centre Park Bar; Gwendolyn Williams, a member of the LLC; and Christopher Williams and Kenneth Scott Bridgewater, two of Centre Park Bar's managers. In a nutshell, the suit alleged that City and redevelopment officials independently and as conspirators, worked behind the scenes to end Centre Park Bar's lease and prevent the individual plaintiffs from participating in the redevelopment project. Plaintiffs' sued a host of people and entities, including the City of Detroit, the Detroit Development Authority, the Detroit Economic Growth Corporation (DEGC), a Detroit police officer, and a Detroit fire captain.

During this litigation, Lotus, LLC filed for bankruptcy, reached a settlement with all Defendants, and agreed to dismiss its claims against all Defendants. (ECF No. 208.) Soon after, the DEGC argued that this Court lacked subject-matter jurisdiction over the individual plaintiffs' claims against the redevelopment officials. (ECF No. 209.) The gist of the DEGC's motion was a shareholder standing argument. Because the individual plaintiffs were all bringing suit based on injuries suffered by the LLC, no longer a party to the case, the individual plaintiffs' injuries were derivative of the LLC's and so the individual plaintiffs' claims really belonged to the LLC. Thus, the individual plaintiffs lacked standing to proceed further. The individual plaintiffs never responded to this motion.

The DEGC and the City also each moved for summary judgment on the merits. (ECF No. 210, 211.) And each are fully briefed. (ECF No. 213, 214, 217, 218.) However, because the DEGC's shareholder-standing argument potentially implicated subject-matter jurisdiction, the Court started there. As the Sixth Circuit treats shareholder standing as a concern either of Article III or Federal Rule of Civil Procedure 17, the Court relied on both doctrines to grant the DEGC's motion. (ECF No. 227.)

Because shareholder standing may implicate Article III (and Rule 17), the Court ordered the remaining parties—the individual plaintiffs and the Detroit defendants—to show cause why the plaintiffs' remaining claims against the City, save one, should not also be dismissed for lack of shareholder standing. (ECF No. 227, PageID.7038.) In response to the Court's show cause order, the City and the individual plaintiffs staked out different positions. The City agreed that all but Kenneth Scott's claim based on his arrest should be dismissed for want of shareholder standing. (ECF No. 228.) Yet hoping to save all their claims, the individual plaintiffs raised a number of arguments. (ECF No. 229.) But only one merits any attention. Christopher Williams says he

suffered an injury separate and distinct from the LLC when he, personally, was issued a noise citation by a Detroit police officer named Lewis. (ECF No. 229, PageID.7050.) Christopher points to the amended complaint, where he alleged the ticket was issued in retaliation for Christopher's public complaints against what he perceived to be a corrupt redevelopment process. (*Id.*; *see also* ECF No. 66, PageID.1931, 1932, 1936–1937.) And Christopher provides a docket sheet showing that in August 2016, an Officer Lewis issued Christopher a noise citation. (ECF No. 231, PageID.7063.) Thus, like Kenneth Scott, Christopher insists he has an official-policy, retaliatory-arrest claim.

Having reviewed the supplemental briefing and materials provided in response to the order to show cause, the Court now returns to the City's motion for summary judgment. For the reasons that follow, Kenneth Scott and Christopher each have standing to bring their First Amendment claims. Both allege individual injuries separate and distinct from any injury to Lotus, LLC. While Kenneth Scott's claim survives summary judgment and will proceed to a bench trial, Christopher's claim does not. The remainder of the individual plaintiffs' claims are dismissed for the reasons set forth in the Court's opinion and order granting the DEGC's motion to dismiss for want of standing. (ECF No. 227.) Thus the Court will grant in part and deny in part the City's motion for summary judgment.

## I.

Consider first, Kenneth Scott's retaliation claim. Kenneth Scott sues Detroit Police officer Robert Harris and Detroit Fire captain Kelvin Harris—each in their official capacity. Bridgewater says the pair arrested him at the behest of the city in retaliation for Bridgewater filing a lawsuit bringing to light alleged public corruption.

**A.**

During his deposition, Kenneth Scott said the police officer and fire captain told him he was going to be arrested because higher-ups in the City wanted to retaliate against him for suing the city. And Kenneth Scott was arrested at the Centre Park Bar for failing to follow the officers' orders to close the bar for overcrowding, charged, and ultimately acquitted following trial. So Kenneth Scott showed an injury separate and distinct from any injury to Lotus, Gwendolyn, or Christopher. *See Old Blast, Inc. v. Operating Eng'rs Local 324 Pension Fund*, 663 F. App'x 454, 457 (6th Cir. 2017). Accordingly, the Court finds that Bridgewater has standing to bring his retaliation claims.

**B.**

Turning to the merits of that claim, the relevant facts are as follows.

Bridgewater, along with Christopher Williams, managed a restaurant and bar in Detroit's Harmonie Park neighborhood. After the City announced a redevelopment project for the area, Bridgewater and Williams submitted a proposal to take part in the project. (ECF No. 211, PageID.5355.) But they submitted their proposal late, (*id.* at PageID.5361–5362), and it was eventually rejected for that reason (*id.* at PageID.5369). Even so, Bridgewater, Williams, and one of the bar's owners publicly complained. (*Id.* at PageID.5398.) In particular, Bridgewater's complaints underscored what he perceived as a corrupt redevelopment process tied to a city-led conspiracy to keep African–American businesses out of Detroit. (ECF No. 211, PageID.5435–5437, 5441–5443.)

Bridgewater says his complaints caused a backlash. Detroit police officers started to focus their attention on Centre Park Bar. (ECF No. 211, PageID.5440, 5444–5445.) Bridgewater

believed the police attention was directed by Mayor Duggan as a ruse to allow the bar's landlord to cancel the lease. (*Id.*) So Bridgewater, along with the others, brought suit. (*Id.* at PageID.5409.)

Bridgewater (along with Lotus, Gwendolyn, and Christopher) sued the city of Detroit, Mayor Michael Duggan, the bar's landlord, a public-private-partnership involved in the redevelopment project, the Harrises, and others. (ECF No. 66.) The lawsuit was extensively litigated and most of the facts relevant to the other claims are not relevant to the remaining claim.

What is relevant to the remaining First Amendment retaliation claim is the lawsuit itself. After the lawsuit was filed, Bridgewater says he noticed even more police attention. (ECF No. 211, PageID.5497.) And the escalation culminated in Bridgewater's arrest. (*Id.* at PageID.5471–5472.)

Bridgewater remembers the events leading up to his arrest. Captain Harris walked into the bar, sometime after midnight, saying he was roused from bed and told to either close down the bar or arrest Bridgewater. (ECF No. 211, PageID.5472.) Bridgewater responded, "come on, man. You know, this is all retaliation from the City. We both know this." (*Id.*) And according to Bridgewater, Captain Harris agreed. (*Id.*) Nevertheless, Captain Harris asked Bridgewater to produce a permit or contract allowing Bridgewater to host patrons in the park adjacent to the bar. (*Id.*) Bridgewater sent someone to retrieve the documents, and Captain Harris said he would give Bridgewater 10 to 15 minutes to produce them. (*Id.*)

In the meantime, Bridgewater took Captain Harris on a tour. Bridgewater showed the fire marshal the entire bar and the party (with DJ) going on in the park outside the bar. (ECF No. 211, PageID.5473.) Bridgewater highlighted that maybe 50 or 60 people, total, were in the establishment. (*Id.*) And during the tour, someone arrived with the documents Captain Harris requested. (*Id.*) Yet upon seeing the documents, Captain Harris abruptly changed course. (*Id.*) Instead of focusing on the permit, Captain Harris told Bridgewater the bar was over capacity and

Bridgewater needed to provide a capacity card. (*Id.* at PageID.5474.) Bridgewater gently pushed back, but still produced the capacity cards. (*Id.*) Even so, says Bridgewater, Captain Harris grew frustrated, telling Bridgewater he was "too late." (*Id.*) So Captain Harris directed Officer Harris to arrest Bridgewater. (*Id.*) And when Bridgewater was in the back of the police car, he heard one of the Harrises say, "I was sent down here to arrest him because this is what the city wants." (*Id.* at PageID.5475.)

For their part, Captain Harris and Officer Harris tell a much different story. Captain Harris said that, at the time, he was a plan examiner and prevention officer for the Detroit Fire Department. (ECF No. 214, PageID.6470–6471.) On the night of Bridgewater's arrest, Captain Harris was taking a shift for another fireman. (*Id.* at PageID.6477.) Captain Harris was sent to the bar via central dispatch, following a complaint of overcrowding. (*Id.* at PageID.6480.) When he got there, Captain Harris asked to see a capacity card, but Bridgewater said he could not find it, and made a weak effort to do so. (*Id.* at PageID.6485.) So Captain Harris ordered the bar shut down because the bar had no posted capacity card, and Bridgewater could not account for the number of patrons. (*Id.* at PageID.6482–6483.) Shortly after Captain Harris ordered the bar to close, Bridgewater produced the capacity card and told the DJ to resume playing because the bar was not shut down. (*Id.* at PageID.6486-6487.) Faced with a non-compliant Bridgewater, Captain Harris asked Officer Harris for assistance. (*Id.* at PageID.6487, 6491.)

Officer Harris was close at hand that night because, in the summer of 2017, he was assigned a post at Gratiot and Randolph streets, near the bar. (ECF No. 214, PageID.6428, 6442.) And that night, Officer Harris remembers Captain Harris asking for assistance. (*Id.* at PageID.6437–6438.) Captain Harris told Officer Harris that Bridgewater was refusing to comply. (*Id.*) So Officer Harris

told Bridgewater to comply in shutting down the bar or face arrest. (*Id.*) Bridgewater refused to comply, and Officer Harris arrested Bridgewater. (*Id.*)

Bridgewater was eventually charged with obstruction (ECF No. 211, PageID.6395), went to trial, and a jury returned a verdict of not guilty (ECF No. 213, PageID.6160).

After his arrest, Bridgewater amended his lawsuit. Bridgewater added an official capacity First Amendment retaliation claim against Captain Harris and Officer Harris. (ECF No. 66.) In particular, Bridgewater says he was arrested because the city was maintaining a policy of retaliation against him.

Captain Harris and Officer Harris now move for summary judgment.

## C.

This case does not involve a jury trial. Thus, it is worth a moment to explain the difference between the Court's role in a bench trial versus the Court's task now at summary judgment.

Federal Rule of Civil Procedure 52 governs bench trials. After hearing the evidence, the Court must make findings of fact and state conclusions of law. Fed. R. Civ. P. 52(a). At a minimum, finding facts means the Court must "evaluate the persuasiveness of conflicting evidence and decide which is more likely true." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc). Deciding which evidence "is more likely true" sometimes means the Court has to assess credibility. *Wooldridge v. Marlene Industries Corp.*, 875 F.2d 540, 543 (6th Cir. 1989) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–75 (1985)).

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Crucially, at summary judgment, the Court "does not sit as a trier of fact . . . even if the case is scheduled to be heard without a jury."

*Med. Inst. Of Minn. v. Nat'l Ass'n of Trade & Technical Schs.*, 817 F.2d 1310, 1315 (8th Cir. 1987). Put another way, Rule 56 does not permit the Court to assess credibility or "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986). Rather, the Court's task is to "determine whether there is a genuine issue for trial." *Id.* A genuine, triable issue exists if, given the facts in the record, a reasonable factfinder could return a verdict for either party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Bridgewater's retaliation claim features three steps. The first step requires Bridgewater to show he engaged in protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394, 399 (6th Cir. 1999) (en banc). Stepping on, Bridgewater needs to point to an adverse action, specifically, one "that would deter a person of ordinary firmness from continuing to engage" in the protected conduct. *Id.* And the third step is to prove a causal connection between the protected conduct and adverse action. *Id.*

The Court does not struggle with the first two steps. Bridgewater filed a civil rights lawsuit claiming he was retaliated against for publicly criticizing the bid process for the redevelopment of Harmonie Park. He says the retaliation escalated after he filed the lawsuit, ultimately resulting in his arrest. The lawsuit is protected conduct. *Bell v. Johnson*, 308 F.3d 594, 607 (6th Cir. 2002). And the arrest is an adverse action. *See Gregory v. Burnett*, 577 F. App'x 512, 518 (6th Cir. 2014). But the causal connection presents a wrinkle in this case. Bridgewater sues a police officer and a fire captain in their official capacities. And that is the "same thing as suing the municipality itself," so Bridgewater must establish that a municipal policy played a part in his injury.[1] *Kraemer v.*

---

[1] Bridgewater sought leave to file supplemental briefing on recent Supreme Court caselaw governing individual-capacity, retaliatory-arrest claims. (ECF No. 232.) But Bridgewater sues the

*Luttrell*, 189 F. App'x 361, 366 (6th Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)).

To establish that a municipal policy violated federal law, Bridgewater needs "objective evidence of a policy motivated by retaliation[.]" *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018). Put another way, "objective evidence of a policy motivated by retaliation" takes the causal-connection inquiry away from the Harrises' motivations (i.e., whether they had probable cause to arrest for a minor offense). *Id*. Instead, the analysis turns on whether Bridgewater has objective evidence establishing that city officials orchestrated a retaliatory scheme in which the officer and fire captain unwittingly played minor roles. *Id.*

On the existence of a policy of retaliation, Bridgewater's argument is straightforward. He says he sued the city of Detroit, the mayor, the police chief, and a number of other entities to protest what he believed was public corruption. Not long after, the Harrises started showing up at his bar, and eventually they arrested him. (ECF No. 211, PageID.5472–5475.) When Bridgewater was arrested, he claims the fire captain (and possibly the officer, too) said the arrest was dictated by the city's higher ups as payback for the lawsuit. (*Id*.) And the higher ups carried out that policy by arranging to have the fire captain and police officer sent to Centre Park Bar to arrest Bridgewater on trumped up ordinance violations. (*Id.*) So Bridgewater says what the fire captain and police officer told him amounts to evidence of an official policy of retaliation against those who sue the city.[2]

_____

Harrises in their official capacities. (*See* ECF No. 66, PageID.1922.) So Bridgewater's request is denied.

[2] Well after the close of discovery and after the motions for summary judgment were fully briefed, Bridgewater sought to add the affidavit of Robert Davis. (ECF No. 219.) Davis is the law clerk for Bridgewater's lawyer and has been actively involved in the case. His affidavit suggests that he is also a witness to Bridgewater's conversation with the Harrises on the night Bridgewater was arrested. However, Davis' affidavit was provided too late to be considered on summary

For their part, the Harrises say Bridgewater's claim lacks evidence. They insist the only evidence of a causal connection or a municipal policy comes from Bridgewater's "convenient and speculative testimony[.]" (ECF No. 211, PageID.5173, 5174–5175.) Discredit that testimony, they say, and there is no evidence to support Bridgewater's retaliatory-arrest claim. So the Harrises urge the Court to disbelieve Bridgewater's testimony and grant summary judgment in their favor.

In reality, the Harrises might be right. Bridgewater's testimony may well be so "convenient" and "speculative" that it strains credulity. Given the evidence in the record about consistent nuisance complaints lodged by the bar's neighbors (including a hotel and its patrons) alongside photographs of multiple bar events spilling into a public park near the bar, (ECF No. 211-4, 211-5, 211-17), Bridgewater's arrest may well have had everything to do with noise and overcrowding and nothing to do with a retaliatory scheme set in motion by "the higher ups."

Yet drawing "all justifiable inferences" in Bridgewater's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986), a reasonable factfinder could credit Bridgewater's deposition testimony. If so, a reasonable factfinder could identify objective evidence of a municipal policy of retaliation.[3] When Captain Harris entered Bridgewater's bar on the night of the arrest, Bridgewater

---

judgment. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 476 (6th Cir. 2002) ("Fed. R. Civ. Pro. 6's requirement that cause be shown for affidavits not attached to the original motion, is designed to prevent the moving party from springing new facts on the nonmoving party when it is too late for that party to contest them." (cleaned up)); Fed. R. Civ. P. 6(c)(2). And the affidavit potentially raises a red flag pursuant to Model Rule of Professional Conduct 3.7 because Davis purports to be both law clerk to trial counsel and fact witness. So the Court grants the motion to strike (ECF No. 220.)

[3] Defendants make no argument that Bridgewater's recollection of what the Harrises said to him is not "objective" evidence as the Supreme Court uses that term in *Lozman*. But even so, Bridgewater, if believed, heard a police officer say the city wanted Bridgewater arrested for filing a lawsuit. So, at a minimum, Bridgewater was not testifying to what he perceived to be an official policy. Moreover, even if the rule in *Lozman* is as narrow as the dissent believes it to be, Bridgewater's testimony still suffices to create a fact issue. *See Lozman*, 138 S. Ct. at 1956 (Thomas, J., dissenting). If believed, Bridgewater heard a police officer say the city wanted him arrested, thus allowing a reasonable factfinder to infer an official policy of intimidation; as the

remembers Captain Harris saying he was roused from bed by his superiors and told to put Bridgewater between a rock and a hard place, i.e., either shut down the bar or face arrest. And Bridgewater remembers at least one, possibly both, of the Harrises agreeing that giving Bridgewater the Hobson's choice was what the city wanted on account of the lawsuit. (ECF No. 211, PageID.5474–5475.) So Bridgewater, if believed, has evidence that two city employees were told to arrest Bridgewater because of Bridgewater's lawsuit. Thus, if a reasonable factfinder were to credit Bridgewater's account of the arrest, then Bridgewater has taken all the steps he needs to establish an official-policy, retaliatory-arrest claim.

And under Federal Rule of Civil Procedure 56, credibility determinations are not to be entertained at summary judgment. *FDIC v. Jeff Miller Stables*, 573 F.3d 289, 295 (6th Cir. 2009). Deciding which side's version is more likely true has to wait until the bench trial. So with this conflicting evidence, Bridgewater's claim survives summary judgment.

In short, the Harrises are not entitled to summary judgment on Bridgewater's retaliatory arrest claim because the claim turns on resolving the parties' different versions.

## II.

Turn next to Christopher's retaliatory-arrest claim.

## A.

In response to the Court's show cause order, Christopher claims he was also ticketed in retaliation for exercising his First Amendment rights. He did not provide any of the tickets. Instead, he attached docket sheets indicating that he received numerous citations from Detroit police

---

police harassment had been ongoing for some time, Bridgewater's testimony allows a factfinder to conclude the policy was premeditated; coming from the mouth of two city employees gives an objective gloss to the retaliatory policy; disrupting the peace by running a bar bears little relation to filing a civil rights lawsuit; and, like the right to petition, the right to bring civil rights suits is a higher-order First Amendment right. *Id.*

officers. (ECF No. 231-1.) However, only one of the citations has anything to do with the complaint in this case. (ECF No. 231, PageID.7063.) That one citation, given by an Officer Lewis, is mentioned in the amended complaint. (ECF No. 66, PageID. 1936–1937.) None of the others are, nor are they mentioned in any of the summary judgment briefing. So the Court will consider only the citation issued by Lewis. Christopher alleges that this citation was the product of machinations by the mayor and police chief because he publicly complained about the redevelopment project's bid process. (ECF No. 66, PageID. 1936–1937.) And based on the docket sheet, along with the allegations in the amended complaint, Christopher thinks he has enough to survive summary judgment on an official-policy, retaliatory-arrest claim.

## B.

Not so. To prevail at this stage, Christopher, like Kenneth Scott, needs to show, among other things, an official policy of retaliation. *Lozman*, 138 S. Ct. at 1954. And he needs objective evidence of that official policy. *Id.* Subjectively, Christopher certainly believes the City was out to get him. (ECF No. 211, PageID.6077–6078.) Christopher bases his opinion on a chain of inferences flowing from the timing of the noise citations. (*Id.*) Christopher insists he only started receiving noise citations after he complained about the bidding process. (*Id.*) Thus, Christopher infers that complaining about the bid process must have spurred redevelopment officials to complain to the mayor. And the mayor must have told the police chief to send someone to cite Christopher for an ordinance violation. (*Id.*) And so Christopher thinks the city was the moving force behind the citations because Christopher complained about the bidding process. (*Id.*) But Christopher's perception of a policy, based on inferencing from temporal proximity, is not objective evidence of an official policy of retaliation.

Moreover, Bridgewater's supposed evidence of an official policy is no help to Christopher. First, Christopher does not say that it is. Second, Bridgewater says he has evidence of a municipal policy of retaliation against people who sue Detroit. But Christopher thinks the city retaliated against him for publicly complaining about the redevelopment process. Indeed, Christopher received the noise citation before he filed suit. So Bridgewater and Christopher point to different municipal policies.

Thus, Christopher's claim does not survive summary judgment.

### III.

That leaves the individual plaintiffs' remaining claims against the City of Detroit. But, again, these claims all fail because the individual plaintiffs lack standing. Thus, for the reasons stated in the Court's opinion and order granting the DEGC's motion to dismiss for lack of shareholder standing, the Court dismisses the rest of the individual plaintiffs' claims.

### IV.

Accordingly, the Court GRANTS IN PART and DENIES IN PART the City of Detroit's motion for summary judgment. (ECF No. 211.) Kenneth Scott's retaliatory arrest claim turns on a credibility determination. But no reasonable factfinder could return a verdict for Christopher on his retaliatory arrest claim, and the individual plaintiffs' remaining claims are all dismissed for lack of shareholder standing. So only Kenneth Scott's claim will proceed to a bench trial.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: July 22, 2019

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 22, 2019.

<u>s/William Barkholz</u>
Case Manager to
Honorable Laurie J. Michelson