UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH SCOTT BRIDGEWATER,

     Plaintiff,

v.

ROBERT HARRIS and
KELVIN HARRIS,

     Defendants.

Case No. 16-14112

Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Centre Park Bar hosted a party called "Ticket to Paradise" on Saturday, July 22, 2017. Kenneth Scott Bridgewater was managing the bar that night, and he indeed received a ticket—but not to paradise. Instead, his trip ended in jail. And ever since that incident, the reason for Bridgewater's arrest has been hotly disputed. Bridgewater alleged that he was arrested because the City of Detroit had a policy of retaliation against him. The two remaining defendants in this case— Police Sergeant Robert Harris and Fire Chief Kelvin Harris—contend that Bridgewater was arrested for obstructing a fire official, not because of retaliation.

To resolve the dispute, this Court held a three-day bench trial. Based on the evidence presented and governing law, the Court finds Bridgewater's arrest did not constitute First Amendment retaliation. Therefore, Sergeant Harris and Chief Harris are not liable for damages.

## I.

### A.

Bridgewater was a general manager of Centre Park Bar ("Bar"), which was located at 1407 Randolph Street in the Harmonie Park neighborhood of the City of Detroit ("City"). (Def. Exs. 11-

12.) Bridgewater and Christopher Williams, his brother, operated the bar, which was owned by their family's company: Lotus Industries, LLC ("Lotus"). (ECF No. 278, PageID.8367–8369; ECF No. 279, PageID.8484, 8487, 8515, 8563.)

The Bar opened in April 2014. (ECF No. 278, PageID.8368.) Included in the Bar's property was an outdoor cafe, for which the Bar received an annual permit from the City. (Def Exs. 11, 12.) Among the permit's many requirements was a mandate that the patio area close for the night by 1:00 a.m. (*Id.*) The posted occupancy card allowed a maximum of 100 people on the patio. (ECF No. 278, PageID.8171.)

Moving ahead to 2015, the City's Downtown Development Authority ("DDA") invited bids for a redevelopment project in Harmonie Park. (ECF No. 227, PageID.7028.) Bridgewater and Williams put together a bid, but they submitted their proposal past the deadline, and the DDA refused to accept late proposals. (ECF No. 227, PageID.7028.) Then, Bridgewater and Williams publicly complained in the media that the bid process was a sham and a conspiracy orchestrated by the City. (ECF No. 211-16, PageID.5851.) They believed that, regardless of the bids, the decision had been made to award the project to businessman Dennis Archer, Jr. (ECF No. 211-16, PageID.5851–5864.) And after they made those accusations, they claim that the Detroit Police Department ("DPD") watched the Bar more closely. (ECF No. 211, PageID.5890.) Around this time, the nearby Hilton Garden Inn also filed a noise complaint against the Bar with the City. (Def. Ex. 22.)

On November 19, 2016, Bridgewater—along with Lotus, Williams, and his mother (the Bar's owner)—filed this lawsuit, alleging that the City and others had conspired to prevent Plaintiffs' participation in the Harmonie Park redevelopment. (ECF No. 1.) Then, the Plaintiffs amended their complaint to allege they suffered First Amendment retaliation for bringing this suit.

(ECF No. 66.) In particular, they claimed that the City and its officers issued retaliatory citations and then, eventually, arrested Bridgewater. (*Id.*) That arrest, in turn, set off a chain of events resulting in the Bar's permanent closure. (*Id.*)

The amended complaint included four plaintiffs, seven defendants, and multiple counts, but the claims were significantly narrowed by the time of trial. More specifically, Lotus filed for bankruptcy and settled its claims. (ECF No. 126, PageID.2462; ECF No. 208.) And following dispositive motion practice, Bridgewater was the only plaintiff who was not dismissed. (*Id.*) The only claim that survived summary judgment was Bridgewater's allegation of First Amendment retaliation against the two remaining defendants: Police Sergeant Robert Harris and Fire Chief Kelvin Harris. *See generally Bridgewater v. Harris*, No. 16-14112, 2019 WL 3289845 (E.D. Mich. July 22, 2019) (order denying in part and granting in part motion for summary judgment); *Williams v. City of Detroit*, No. 16-14112, 2019 WL 2410719 (E.D. Mich. June 7, 2019) (order granting the DEGC's motion to dismiss). The Court drew "all justifiable inferences" in Bridgewater's favor at the summary-judgment stage, as it must, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986), and found that there was a question of fact as to whether Bridgewater was arrested by City officers as retaliation for filing his original lawsuit, *see Bridgewater*, 2019 WL 3289845, at *5.

So the case proceeded to trial with one plaintiff, two defendants, and one claim. That is, Kenneth Bridgewater alleged that two officials from the City (Robert Harris and Kelvin Harris) orchestrated his July 2017 arrest in retaliation for his protected First Amendment right to file a lawsuit. (None of the other claims—including the claim in the original complaint about the bid rejection—were still at issue.) A three-day bench trial on this lone question began on November 25, 2019.

**B.**

On the first day of the trial, the Court heard testimony from Defendant Robert Harris, a 22-year veteran officer of the DPD. (ECF No. 278, PageID.8233.) At the time of the events here, he was a sergeant with the department's Violent Crime Task Force. (ECF No. 278, PageID.8234.)

In the wake of several high-profile shootings during the summer of 2017, DPD supervisors ordered an increased officer presence in certain parts of downtown Detroit, Sergeant Harris testified. (ECF No. 278, PageID.8294.) (This was corroborated by Lieutenant Ilaseo Lewis, who testified later in the trial. (ECF No. 279, PageID.8659.)) The DPD had issued a directive to station 20 to 30 additional officers downtown on summer nights during the weekends. (*Id.*) Sergeant Harris recalled his supervisor ordering him to "Go downtown. Be present. Talk to people. And don't let anything bad happen where your station is." (ECF No. 278, PageID.8295.) He said his supervisor did not tell him anything about Centre Park Bar in particular. (ECF No. 278, PageID.8294.) Nor was Sergeant Harris then aware of this lawsuit (filed about 7 months earlier) or even the identity of Bridgewater. (ECF No. 278, PageID.8295–8296.)

That summer, Sergeant Harris often was stationed at the intersection of Gratiot and Randolph near Harmonie Park. (ECF No. 278, PageID.8295, 8303.) Sergeant Harris sought to build rapport with the owners of bars in the area, including Centre Park Bar. (ECF No. 278, PageID.8309–8310.) He also periodically performed Michigan Liquor Control Commission ("MLCC") inspections. (*Id.*) Overall, between 2014 and 2018, the MLCC fined Centre Park Bar at least 18 times for violations. (ECF No. 278, PageID.8407; Def. Ex. 8.) Although his interactions with Bridgewater during that time were sometimes "testy," Sergeant Harris described their relationship as professional "for the most part." (ECF No. 278, PageID.8309–8310.)

One of those "testy" interactions took place on July 14, 2017, the Friday night before the event in question. (ECF No. 278, PageID.8323.) According to an MLCC violation report, Sergeant Harris and another officer inspected Centre Park Bar and asked to see Bridgewater's MLCC license at 10:37 p.m. (Def. Ex. 9.) Bridgewater first handed the officers an expired license. (*Id.*) Then, he located the correct license in an envelope. (*Id.*) The officers informed Bridgewater that they would submit an MLCC violation for failure to display his liquor license. (*Id.*) The officers resumed patrolling the area until 12:30 a.m., when they returned to ask Bridgewater to turn down the noise from the Bar's outdoor speakers. (*Id.*) They did so again at 1:05 a.m. (*Id.*) This time, Bridgewater became argumentative. (*Id.*) Because Sergeant Harris thought that Bridgewater smelled like alcohol, he warned Bridgewater that drinking alcohol on his bar's premises would constitute another MLCC violation. (*Id.*) Bridgewater first said he did not drink. (*Id.*) According to Sergeant Harris's testimony, Bridgewater then told the other officer, "Get the fuck out my face and don't talk to me anymore." (ECF No. 278, PageID.8343.)

Sergeant Harris also recalled seeing flyers for parties outside the Bar and observed the crowds firsthand. (ECF No. 278, PageID.8302–8307.) The pedestrian traffic often would block the area near the Bar's outdoor patio. (*Id.*; Def. Exs. 16, 20.)

One such party, the one at the center of this case, took place on Saturday, July 22, 2017. (Def Ex. 10.) As part of "Summer Saturdays" at Centre Park Bar, that night's event was called "Ticket to Paradise." (*Id.*) The promotional poster advertised "OUTDOOR TIKI BARS & FROZEN TROPICAL DRINKS" and "SOUNDS BY DJ CLAY." (*Id.*) That evening, Sergeant Harris arrived at his post at 7:45 p.m. (ECF No. 278, PageID.8238–8239.) Sergeant Harris again had been assigned to the intersection of Randolph and Gratiot. (*Id.*) His shift was scheduled from 8 p.m. to 4 a.m. (*Id.*)

Around midnight, he noticed that the Bar's event appeared to be overcrowded. (ECF No. 278, PageID.8253.) Guests "were all over, they were in the park area, they were inside the interior of the bar and they were on the sidewalk." (ECF No. 278, PageID.8238–8239.) So Sergeant Harris called dispatch and requested a fire marshal. (*Id.*)

## C.

That request led to a phone call to the home of the other defendant, Kelvin Harris, who also testified at trial. At the time of the relevant events, Harris was a captain in the Detroit Fire Department, where he has worked for 20 years. (ECF No. 278, PageID.8192–8193.) Shortly before the trial, he became chief of fire prevention. (ECF 278, PageID.8163.) As part of his job, he received national and state certifications as a fire inspector. (ECF No. 278, PageID.8190–8191.) Based on his training and experience, Chief Harris testified, he was knowledgeable about issues of fire prevention and life safety. (*Id.*)

Chief Harris was not originally scheduled to be on call the night of the Ticket to Paradise party. (ECF No. 278, PageID.8198–8199.) Rather, he was working that night only because he agreed to fill in for a colleague, Captain Derrick Thomas. (*Id.*) Captain Thomas did not instruct Chief Harris about how to do his job or say anything about the Bar. (*Id.*) At about 12:15 a.m. on July 23, a dispatcher called Chief Harris at home and asked him to investigate a complaint of overcrowding at the Bar. (*Id.*) The dispatcher did not give him any other information or orders. (*Id.*) At that time, Chief Harris was not aware of the litigation between the Bar and the City, nor had he ever received orders to shut down the Bar from anyone employed by the City, including Mayor Duggan and DPD Chief James Craig. (ECF No. 278, PageID.8195, 8203–8204.)

Chief Harris arrived at the bar around 12:40 a.m. (*Id.*) He observed that no occupancy card was posted and that one of the two exits was blocked by folding tables. (ECF No. 278,

PageID.8168, 8213.) With only one accessible exit, Chief Harris testified, capacity was limited by law to under 50 people. (ECF No. 278, PageID.8171.) Chief Harris estimated that about 130 people were on the outdoor patio, although he stopped counting once he had reached 50 people. (ECF No. 278, PageID.8220.)

Chief Harris located Bridgewater and said he needed to inspect the outdoor area because of a report of overcrowding. (ECF No. 278, PageID.8174.) He asked Bridgewater how many people were at the outdoor bar, and Bridgewater responded that he did not know. (*Id.*) Bridgewater eventually produced the occupancy card, but not until 40 minutes later. (*Id.*) Although that card allowed up to 100 guests, at least two exits needed to be open in that scenario. (ECF No. 278, PageID.8211.) So Chief Harris determined that the outdoor area was unsafe because at least 50 people were there and there was only one open exit. (*Id.*) He further testified: "[People] had taken chairs and barred the exits. So, in a panic, you know, nobody is going to be trying to move tables and chairs and therein lies the problem, it's unsafe. You know, fire may not get you, but you can get trampled." (*Id.*)

Since the Bar's permit required the patio to shut down at 1:00 a.m., the closing time was approaching anyway. (ECF No. 278, PageID.8289.) As Chief Harris had done at other venues in the past, he ordered the Bar to close for the short remainder of the night because of overcrowding. (ECF No. 278, PageID.8211.) But unlike most other times, the management at the Bar was uncooperative. (*Id.*) At first, the Bar complied, with Christopher Williams announcing from the DJ stand that the Bar was closed for the night. (ECF No. 278, PageID.8178.) But then, Bridgewater took the microphone and said the bar was not closed. (*Id.*) At this point, Chief Harris saw Sergeant Harris and another DPD officer on patrol and told them that he needed assistance to vacate the bar. (ECF No. 278, PageID.8179.) Chief Harris does not have arrest authority, he testified, and did not

personally tell Bridgewater that he would be arrested. (ECF No. 278, PageID.8202.) Sergeant

Harris said he had never met Chief Harris before that night. (ECF No. 278, PageID.8224.)

Next, Sergeant Harris approached Bridgewater and Williams and he "asked both of them

multiple times to comply with the fire marshal's orders." (ECF No. 278, PageID.8249.) The two

men refused. (*Id.*) Sergeant Harris testified:

> Mr. Bridgewater told me just write him a ticket because he was not going to comply.
> I advised him that he wasn't going to get a ticket, it was an arrestable offense. He
> told me to just arrest him then and he turned around and put his hands behind his
> back. . . .
>
> I told Mr. Williams, "I don't want to arrest anybody, I just want you guys to comply
> with what the Fire Marshal is asking you to do." Mr. Williams said he would not.
> So, I went back and I asked Mr. Bridgewater, again, to comply with the Fire
> Marshal's orders. He again refused and I arrested him. . . .
>
> So, after I arrested Mr. Bridgewater, I put him in the back of the police car. I came
> back, I talked to Mr. Williams. I said, "Okay, I need you to comply with the Fire
> Marshal's orders." He told me, "You've already arrested my boy, so, we're good.
> We could stay open." I told him, "No, you can't. You have to comply with the Fire
> Marshal's orders, and if you don't, you're going to be arrested, too."

(ECF No. 278, PageID.8258–8259.) After Sergeant Harris gave that explanation, Williams took

the microphone and announced that the Bar was closed, and he had security clear the premises.

(ECF No. 278, PageID.8325.)

Sergeant Harris placed Bridgewater under arrest for felony resisting and obstructing,

although a supervisor later reduced the charge to interfering with a city employee in the

performance of one's duties (a misdemeanor). (ECF No. 278, PageID.8333–8334.) Sergeant Harris

believed there was probable cause for the arrest because Bridgewater "failed to comply with the

fire marshal." (ECF No. 278, PageID.8260.) Bridgewater's actions "blew my mind," Sergeant

Harris said, as this was the first time in his two decades as a police officer that he had ever arrested

someone for failing to comply with a fire marshal. (ECF No. 278, PageID.8269.)

Proceedings in state court followed, and Bridgewater was bound over for trial on a felony charge of resisting. (ECF No. 279, PageID.8611–8612.) Bridgewater ultimately was acquitted. (*Id.*)

**D.**

In their testimony, Bridgewater and Williams recalled the events differently from the City officers.

Both Bridgewater and Williams testified that the arrest was pretextual. Throughout their testimony, Bridgewater and Williams argued that the City had a policy of retaliation and that the policy was the real reason that Bridgewater was arrested. (*See, e.g.*, ECF No. 278, PageID.8402.) They made numerous allegations that Detroit Mayor Mike Duggan and Dennis Archer, Jr. orchestrated a plan to drive the Bar out of business, including harassment of the Bar and the pretextual arrest of Bridgewater. (*See, e.g.*, ECF No. 279, PageID.8610–8611.)

One particular allegation stemmed from a meeting in the summer of 2016—months before Bridgewater and Williams filed this lawsuit but after they had lost the bid for the Harmonie Park redevelopment. (ECF No. 278, 8381–8385; ECF No. 279, PageID.8493, 8625.) At a Michigan Black Bar Owners Association event, Bridgewater and Williams approached Mayor Duggan. (*Id.*) Bridgewater shared some "problems" with the mayor and told him that the Bar faced police scrutiny because Archer "want[ed] our space." (ECF No. 279, PageID.8493.) According to Bridgewater, Mayor Duggan responded, "Bullshit. . . . I got an email from a hotel manager right here saying [the police scrutiny was] about noise." (*Id.*) Without some corroboration first of a City policy of retaliation, the Court granted the City's request for a protective order to prevent Mayor Duggan and Chief Craig from testifying. (ECF No. 262.) As will be discussed, none of the

witnesses called, including Dennis Archer, Jr. and Lieutenant Ilaseo Lewis, provided any such corroboration.

As for the Ticket to Paradise party, Bridgewater recalled sitting at the Bar around midnight when he saw Chief Harris arrive. (ECF No. 279, PageID.8495.) He approached Chief Harris, who said, "I'm either here to arrest you or shut this place down." (ECF No. 279, PageID.8497.) Bridgewater responded, "You're standing in an empty room, what's the problem?" (*Id.*) Chief Harris told him, "I need to know about your park permit outside." (*Id.*) Then, Williams left to print the permit from his email. (*Id.*) While Bridgewater and Chief Harris waited for Williams, they walked through the Bar's outside patio. (*Id.*)

Bridgewater testified: "You have to understand that he never mentioned overcrowding when he got there because it wasn't overcrowded. Never once ever said that. Only thing he asked for was a permit. It was never overcrowding. That was never the issue." (*Id.*) When Williams returned with the printout, Chief Harris said, "That's not what I asked for." (ECF No. 279, PageID.8498.) After Chief Harris said, "I want your capacity cards," Bridgewater walked to an area of the Bar and provided them to Chief Harris. (*Id.*)

"And he says, 'Well, I gave you your time. That's it, party's over,'" Bridgewater testified. (*Id.*) "And by the time I knew that, [Sergeant Harris] walks over, says, 'Put your hands behind your back.' I'm shocked." (*Id.*) "I said, 'You know why you were sent down here. You know what you're doing is wrong.' I told both of them." (ECF No. 279, PageID.8499.) He continued, "They knew I was in the lawsuit. . . . 110 percent, they knew I was in a lawsuit." (*Id.*)

Williams testified that DPD issued tickets to him and the Bar only because they were "sent down there to force these tickets upon us." (ECF No. 278, PageID.8391.) He recalled as many as 20 or 30 police officers in the vicinity of the Bar during the summer of 2017, which was a greater

number than in recent years. (ECF No. 279, PageID.8471.) Williams also said that the Bar had not changed its operations in a way that warranted a bigger police presence. (ECF No. 278, PageID.8399.) He noted that other bars played loud music without facing such police scrutiny. (ECF No. 279, PageID.8469.) Regarding the Ticket to Paradise party, Williams said he did not personally make an effort to count the number of people on the patio. (ECF No. 279, PageID.8431.) He recalled shutting down the music but said there was no microphone that night. (ECF No. 279, PageID.8442, 8447.) Williams denied the claim that Bridgewater turned the music back on. (ECF No. 279, PageID.8446.) Although he saw Sergeant Harris arrest Bridgewater, Williams did not hear their conversation. (ECF No. 279, PageID.8445.)

## E.

The Court also admitted into evidence the testimony of David Kipfmiller, who was the general manager of the Hilton Garden Inn hotel that was right near the Bar. In August 2017 Kipfmiller had testified in a related nuisance abatement case against the Bar in state court. (The Court granted the defendants' motion to admit Kipfmiller's earlier testimony both because he was an unavailable witness under Federal Rule of Evidence 804(a)(5) and because Bridgewater's counsel had stated at a pretrial conference that he would not object. (ECF No. 280, PageID.8693–8702.))

The Hilton filed a noise complaint with the City in 2016. (Def. Ex. 22). Because of complaints from guests that the noise from the Bar was too loud, Kipfmiller said, the business had to give refunds to many customers. (*Id.* at 8.) Kipfmiller testified that certain clients canceled events due to the noise coming across the street from the Bar, causing an estimated $8,000 in lost revenue during some weeks. (*Id.* at 8, 48.) In particular, he recalled the Wednesday night "Bike Nights" hosted by the Bar during the summer, during which a DJ played "loud music on the patio"

late in the night and motorcycles would "come in and park everywhere." (*Id.* at 41.) During the summer of 2016, the Hilton contacted the police with noise complaints "weekly for Bike Night . . . as well as quite a lot of other nights." (*Id.* at 41–42.) Kipfmiller occasionally asked management at the Bar to "turn down the DJs," and "sometimes they did, sometimes they did not." (*Id.* at 46.) That tactic "did not work very well because the music continued, the bike nights continued, and the complaints continued." (*Id.* at 47.) Around that time, the Hilton kept a log of guest complaints and asked the City for help with the noise issues (as Mayor Duggan had told Bridgewater at the Black Bar Owners Association event). (*Id.* at 12–13; ECF No. 278, PageID.8382.)

The judge in the state-court nuisance abatement case found the Bar liable for violating the City's noise ordinance on certain dates in July 2017. (ECF No. 211-6.)

### F.

Finally, the Court heard testimony from two other witnesses: businessman Dennis Archer, Jr. (the bid winner who Bridgewater believes was trying to drive the Bar out of business) and DPD Lieutenant Ilaseo Lewis.

Archer stated that he was familiar with Bridgewater as well as the Bar and that he had been in the establishment before; Bridgewater's counsel elicited no other testimony from Archer, and the defense did not examine him. (ECF No. 279, PageID.8534–8536.) When the Court asked Archer whether he ever said to Williams or Bridgewater that it was his "intent to destroy their business and shut them down," Archer answered, "No, Your Honor." (ECF No. 279, PageID.8536–8537.)

Next, Lieutenant Lewis, a 42-year veteran of the Detroit Police Department, took the stand. (ECF No. 279, PageID.8656.) He testified that officers in the summer of 2017 were directed to provide an extra presence in Downtown Detroit because of recent violence in the area. (ECF No.

279, PageID.8659.) But he was never asked by a superior to target Centre Park Bar, he said. (ECF No. 279, PageID.8660, 8682.) And he was never given any special order or directive to issue noise complaints. (ECF No. 279, PageID.8659.) And he was not told "to take a stricter line at Centre Park Bar." (ECF No. 279, PageID.8682.)

Lieutenant Lewis further testified that there were not between 20 and 30 police officers stationed at the intersection of Randolph and Gratiot, but that they "would put maybe one, two, three officers there at the most[;] if there's an issue we might bring more over." (ECF No. 279, PageID.8673.) He said he was aware of "frequent 911 calls" from people at the Hilton Garden Inn. (ECF No. 279, PageID.8666.) In response, he often went to Centre Park Bar to ask management to turn down the music, which only sometimes was effective. (*Id.*) And from what he observed in responding to the 911 calls, he had no reason to believe the calls were fake or made up. (ECF No. 279, PageID.8686.) Lieutenant Lewis also testified that photographs shown at trial, including defense exhibit 10, were an accurate representation of the large crowds at the Bar on many weekends. (ECF No. 279, PageID.8664.)



(Def Ex. 10.)

On the morning of November 27, 2019, the parties rested and gave their closing arguments. (ECF No. 280.) They subsequently submitted proposed findings of fact and conclusions of law. (ECF Nos. 284, 285.)

## II.

As a general principle, there is "no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment." *McCurdy v. Montgomery Cty.*, 240 F.3d 512, 520 (6th Cir. 2001). The First Amendment generally prohibits government officials from subjecting an individual to retaliatory actions, including arrests, for speaking out. *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

To prove a First Amendment retaliatory arrest claim, Bridgewater must establish (1) that he engaged in protected conduct, (2) that an adverse action was taken against him "that would deter a person of ordinary firmness from continuing to engage" in that conduct, and (3) that there is a causal connection between the protected conduct and adverse action. *See Thaddeus-X v.*

*Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). "The plaintiff pressing a retaliatory arrest claim must [also] plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). "Absent such a showing, a retaliatory arrest claim fails." *Id.* at 1725.

The parties agree that Bridgewater engaged in protected conduct: filing this lawsuit against the City of Detroit and Mayor Duggan on November 19, 2016. The parties also do not dispute that Bridgewater suffered an adverse action: his arrest on the morning of July 23, 2017. What this case turns on is the third element, i.e., whether there was a causal connection between the lawsuit and the arrest.

Although probable cause generally will defeat a § 1983 First Amendment retaliation claim, two exceptions exist in a case like this, where the defendant officers are being sued in their official capacity. The Supreme Court recently outlined one set of conditions that allow a First Amendment retaliation claim to proceed despite probable cause for an arrest. *See Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954–55 (2018). First, there must be an "official municipal policy of intimidation." *Id.* at 1954 (internal quotation marks omitted). Second, the municipality must have "formed a premeditated plan" to retaliate against the plaintiff. *Id.* Third, the plaintiff must present "objective evidence of a policy motivated by retaliation." *Id.* Fourth, there must be "little relation" between the protected speech and the offense that led to the arrest. *Id.* Finally, the protected speech must be "high in the hierarchy of First Amendment values," such as the freedom to petition. *Id.* at 1955.

In addition to that very narrow exception, last year the Court recognized another situation when the no-probable-cause requirement does not apply. *See Nieves*, 139 S. Ct. at 1727. In particular, if "a plaintiff presents objective evidence that he was arrested when otherwise similarly

situated individuals not engaged in the same sort of protected speech had not been," the existence of probable cause will not preclude a First Amendment retaliation claim. *Id.*

So unless the case falls under either of the two exceptions outlined in *Lozman* and *Nieves*, Bridgewater also must plead and prove that there was no probable cause for the arrest. In turn, the Court will make findings on the probable cause determination and then the causation element.

**A.**

The Court finds that Bridgewater failed to prove that probable cause was lacking.

First, the Court notes that issues already considered in a prior criminal proceeding may estop plaintiffs from relitigating the claim in a subsequent civil action. *See Hinchman v. Moore*, 312 F.3d 198, 202 (6th Cir. 2002). This is because "a state-court judgment is given the same preclusive effect that it would have under the law of the state in which the judgment was rendered." *Id.* (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)).

Under Michigan law, collateral estoppel applies when "there is identity of parties across the proceedings," "there was a valid, final judgment in the first proceeding," "the same issue was actually litigated and necessarily determined in the first proceeding," and "the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding." *Id.* (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001)). But such a probable cause determination is not preclusive if the plaintiff "can point to instances where the consideration of falsehoods or the omission of material exculpatory evidence could have colored a state-court judge's decision." *Autrey v. Stair*, 512 F. App'x 572, 579 (6th Cir. 2013); *see also Harcz v. Boucher*, 763 F. App'x 536, 544 (6th Cir. 2019) ("[A] prior probable cause finding does not prevent a plaintiff from relitigating probable cause where the plaintiff claims that the witness who

testified at the state proceeding misstated or knowingly misrepresented facts used to establish probable cause.").

When Bridgewater was bound over for trial by a state court judge, this was equivalent to a finding of probable cause on the felony charge of resisting. *See People v. Seewald*, 879 N.W.2d 237, 240 (Mich. 2016) ("In order to bind a defendant over for trial in the circuit court, the district court must find probable cause that the defendant committed a felony." (citing Mich. Comp. Laws § 766.13)). And that determination has preclusive effect since Bridgewater does not "point to instances where the consideration of falsehoods or the omission of material exculpatory evidence could have colored a state-court judge's decision." *See Autrey*, 512 F. App'x at 579.

And even without preclusive effect, the trial record here established probable cause for the arrest. Under Michigan law, "an individual who obstructs a person who the individual knows or has reason to know is performing his or her duties, is guilty of a felony." *People v. Chapo*, 770 N.W.2d 68, 74 (Mich. Ct. App. 2009) (citing Mich. Comp. Laws § 750.81d(1)). "'Obstruct' includes 'a knowing failure to comply with a lawful command.'" *Id.* (quoting Mich. Comp. Laws § 750.81d(7)(a)). And that statute includes obstruction of a firefighter. *See* Mich. Comp. Laws § 750.81d(7)(a)(viii). Numerous cases demonstrate that a police officer has probable cause to arrest someone based on a reasonable belief that the individual violated this obstruction statute. *See, e.g.*, *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 363 (6th Cir. 2013) (finding probable cause for plaintiffs' arrest under § 750.81d based on their failure to heed to officers' directives to permit entry into their home so they could secure the scene for EMS personnel or to have the ill individual leave the home); *Wilkerson v. Warner*, 545 F. App'x 413, 428 (6th Cir. 2013) (finding that defendant officer had probable cause to arrest plaintiff based on a reasonable belief that she acted in violation of § 750.81d due to her failure to heed his commands intended to secure the scene for

the EMS personnel); *People v. Farnsworth*, No. 342225, 2019 WL 286555, at *3 (Mich. Ct. App. Jan. 22, 2019) (finding that a rational trier of fact could conclude that defendant obstructed an officer by refusing to leave a bar when ordered to do so). Here, both Sergeant Harris and Chief Harris testified credibly about their efforts to get Bridgewater to comply with the command to shut down the Bar for overcrowding or for not posting an occupancy card. And this command was a lawful one. *See* Detroit City Code § 19-1-22.

In conclusion, Bridgewater neither pled nor proved that probable cause was lacking. So ordinally, "a retaliatory arrest claim fails." *See Nieves*, 139 S. Ct. at 1725. The Court next considers whether the exceptions described in *Nieves* or *Lozman* apply to this case.

**B.**

**1.**

As discussed above, the *Nieves* exception applies only when "a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *See id.* at 1727. Bridgewater has failed to present such objective evidence here. True, Bridgewater said that other nearby establishments also had noisy parties. But even if Bridgewater had shown that other bars were similarly situated in terms of producing noise, a noise violation was *not* the cause of Bridgewater's citation. Sergeant Harris called dispatch to report overcrowding; then, Chief Harris responded to the call and determined that the bar needed to be shut down for the night; and finally, Bridgewater refused to follow the fire marshal's orders. Bridgewater did not show that any bar manager who had not filed a lawsuit against the City behaved that same way and yet avoided arrest. Rather, Sergeant Harris testified that Bridgewater's failure to comply "blew [his] mind" because he had never arrested anyone in his 20 years as a police officer for failing to comply with a fire marshal. Since Bridgewater pointed

to no other individual who engaged in that behavior (while not engaging in protected speech), *Nieves* does not apply.

## 2.

*Lozman* presents the other exception to the general rule that probable cause defeats a claim of retaliatory arrest. For Bridgewater's argument to succeed, he must show (1) that the City had an "official municipal policy of intimidation," (2) that the City "formed a premeditated plan" to retaliate against him for his lawsuit, (3) that there was "objective evidence of a policy motivated by retaliation," (4) that there was "little relation" between the lawsuit and the offense that led to the arrest, and (5) that his protected speech was "high in the hierarchy of First Amendment values." *See Lozman*, 138 S. Ct. at 1954–55.

This Court finds that Bridgewater failed to show that these five elements all existed. To begin, he did not demonstrate either of the first two prongs: that the City had an "official municipal policy of intimidation" against him or that it "formed a premeditated plan" to retaliate against him. Simply put, Bridgewater produced little evidence in those regards other than his unsupported speculation and conspiracy theories. Dennis Archer, Jr. explicitly testified that there was no premeditated plan to retaliate against Bridgewater. Likewise, Lieutenant Lewis said there was no policy to harass Bridgewater or the Bar. Neither Harris knew about any such plan. Rather, there was a heightened police presence in the area due to violence and a police responsiveness to 911 calls about noise complaints. Bridgewater offered no witness testimony or documentary evidence to rebut those witnesses.

Regarding the third prong, objective evidence of a policy motivated by retaliation, Bridgewater also falls short. Three officers of the City testified that they were never given instructions to retaliate against Bridgewater. By contrast, Bridgewater and his brother gave

voluminous testimony that they believed the Bar was targeted. But Bridgewater did not provide *objective evidence* of a retaliatory policy to support his subjective belief.

So for many reasons, the *Lozman* exception also does not apply.

## C.

Even if probable cause had been lacking or either of the above exceptions applied, Bridgewater's argument would not succeed because he did not establish the third element of a First Amendment retaliatory arrest claim: a causal connection between the protected conduct and adverse action.

Bridgewater sought to demonstrate that he was arrested because he filed this lawsuit. The credible facts show quite the opposite.

First, police documented a substantial number of noise complaints about the Bar from guests at the Hilton Garden Inn. The general manager of that hotel confirmed that noise from the Bar's DJs was overwhelming on some nights and that he had to refund many customers. Furthermore, both Williams and Bridgewater (as well as Lieutenant Lewis) confirmed that some of the photos entered as exhibits accurately reflected the scene on the Bar's outdoor patio. These parties with DJs and speakers evidently were very well-attended. It is not credible that the noise complaints from guests at the Hilton were all fabricated, as Bridgewater and Williams allege. The Hilton filed its noise complaint with the City in the summer of 2016, which was many months before this suit began. And a state-court judge found that the Bar had created a nuisance of noise in the same month as the events in this case.

Second, the credible testimony from Police Sergeant Harris and Fire Chief Harris establish that they were not even aware that Bridgewater had filed a lawsuit. They, along with Lieutenant Lewis, testified credibly that they were not ordered by superiors to arrest Bridgewater. Rather,

Sergeant Harris, who did not know until that night that he would be stationed near the Bar, called dispatch because of an overcrowding concern. Chief Harris was called by dispatch while at home, substituting for another officer on call. When he arrived at the Bar, he saw no posted occupancy card and a presence of more than 49 patrons (the maximum for a location with only one unobstructed exit). So he ordered the Bar to close for the night and, after Bridgewater refused to comply, asked police for assistance. In turn, Sergeant Harris gave Bridgewater multiple opportunities to comply. According to Sergeant Harris, Bridgewater did not do so, telling Sergeant Harris "to just arrest him" and then "turned around and put his hands behind his back."

Third, many other facts undermine the allegation that the arrest was caused by a City policy of retaliation. The Court will pick just two examples. First, after this lawsuit was filed by Lotus and the individual plaintiffs, the City continued to renew the Bar's permit despite the noise complaints. (ECF No. 278, PageID.8207; ECF No. 279, PageID.8459; Def. Ex. 12) And although the police forced the Bar to close its patio early on the night in question (by a mere 20 minutes), there is no evidence that this happened on more than one occasion. (*Id.*) Second, as Williams testified, he works for the City's Water Department and has been a City employee since 2006. (ECF No. 278, PageID.8366; ECF No. 279, PageID.8460.) Despite the filing of the lawsuit by Williams and others, Williams continues to be employed by the City. (*Id.*) Such examples further belie the argument that the City, as a result of the lawsuit, instituted a policy of retaliation against Bridgewater (and Williams, who originally was also a plaintiff).

Finally, no other evidence of retaliation materialized. At the summary-judgment stage, the Court allowed the case to proceed to trial based on the allegations from Bridgewater's deposition, which the Court construed in his favor. In particular, Bridgewater testified in his deposition that Chief Harris arrived at the Bar and said he was told to either close down the bar or arrest

Bridgewater. (ECF No. 211, PageID.5472–5475.) Bridgewater responded, "This is all retaliation from the City" and "[w]e both know this"—with which Chief Harris allegedly agreed, according to Bridgewater's deposition. (*Id.*) And Bridgewater testified that he then heard either Chief Harris or Sergeant Harris say, "I was sent down here to arrest him because this is what the City wants." (*Id.*)

At trial, though, Bridgewater testified to a different story. He never stated that Chief Harris confirmed this was "all retaliation from the City." Nor did he testify that one of the two officers said they were "sent down here to arrest him because this is what the City wants." And both Sergeant Harris and Chief Harris denied knowing at the time that Bridgewater had filed a lawsuit.

In Bridgewater's version of events, Sergeant Harris and Chief Harris are both lying and the arrest was pretext for a City policy of retaliation. Essentially, Bridgewater asks the Court to believe the following sequence of events: Detroit Mayor Mike Duggan (angry that Bridgewater filed a lawsuit against the City) used phony noise complaints as a reason to order the DPD to arrest Bridgewater; the higher-ups, like Police Chief Craig, did so by having Sergeant Harris call dispatch for an overcrowding complaint and by having Chief Harris fabricate a charge about the fire code; and Bridgewater was then arrested when he refused to correct the violation (as a pretext).

The Court does not credit these allegations, which insist that people ranging from hotel manager David Kipfmiller to Lieutenant Ilaseo Lewis were lying about the Bar's frequent noisy parties, and that officials in all levels of the City government were involved in an unproven conspiracy targeting Bridgewater. Rather, the Court finds both Sergeant Harris and Chief Harris credible when they say that they were unaware of Bridgewater's lawsuit and that they were not ordered by higher-ups to find a reason to arrest him. Although Bridgewater testified that "110 percent, they knew I was in a lawsuit," he presented no basis for this knowledge. There is no reason

to doubt the credibility of Chief Harris, who is a 20-year veteran of the Fire Department, current chief of fire prevention, and someone well-versed in the fire code. The Court does not find credible the allegation that Chief Harris, who had no arrest powers, arrived on the scene and immediately said, "I'm either here to arrest you or shut this place down." The Court also credits the credibility of Sergeant Harris, a 22-year veteran police officer, who said that he arrested Bridgewater for failure to comply with Chief Harris' orders, not based on retaliatory animus.

### III.

For the reasons given, the Court finds Defendants Robert Harris and Kelvin Harris NOT LIABLE for First Amendment retaliation against Plaintiff Bridgewater. No damages will be awarded. As such, Defendants' motion to preclude Plaintiff from obtaining emotional damages (ECF No. 283) is DENIED AS MOOT. Lastly, the parties are directed to docket the trial exhibits.

IT IS SO ORDERED.

Dated:  February 19, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE